**EUREKA VIII LLC, Plaintiff,**

v.

**NIAGARA FALLS HOLDINGS LLC, Defendant,**

Niagara Falls Redevelopment, LLC, Nominal Defendant.

C.A. No. 1203–N.

Court of Chancery of Delaware, New Castle County.

Submitted: May 2, 2006.
Decided: June 6, 2006.

Andre G. Bouchard, James G. McMillan, III, Bouchard, Margules & Friedlander, P.A., Wilmington, for Plaintiff.

David S. Eagle, Patrick A. Costello, Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P., Wilmington, for Defendant.

## OPINION

STRINE, Vice Chancellor.

Plaintiff Eureka VIII LLC ("Eureka") holds a 50% membership interest in Niagara Falls Redevelopment, LLC ("Niagara Redevelopment"), and alleges that Niagara Falls Holdings LLC ("Holdings"), the owner of the remaining 50% interest in Niagara Redevelopment, has committed several material breaches of the Niagara Redevelopment LLC Agreement (the "LLC Agreement"). As a result, Eureka seeks a declaration that Holdings has relinquished its membership interest and retains only the economic rights of its ownership stake in Niagara Redevelopment. This claim is before me now on Eureka's motion for summary judgment.

Specifically, Eureka alleges that Holdings breached the LLC Agreement: 1) by transferring ownership of 32% of Holdings in 1999; 2) by granting a security interest in the trust that owned Holdings in 2001; 3) upon the death of an individual, which occurred in 2003, who was required by the LLC Agreement to retain voting control of Holdings; and 4) when a receiver was appointed to manage the trust that controlled Holdings. Holdings concedes that two of these events, in fact, do breach the LLC Agreement. It contests the remaining two breaches.

Eureka has proffered a remedy for the breaches whereby Holdings would retain only its economic interest and not have the right to participate in the management of Niagara Redevelopment. Eureka's suggested remedy draws its inspiration from § 18–702(b)(3) of the Delaware Limited Liability Company Act (the "LLC Act"). Eureka concedes that § 18–702(b)(3) does not apply directly to this case, because it applies only when an LLC member assigns its entire interest to a third party, but urges me to consider adopting it as a fitting remedy for the type of breaches committed by Holdings. It requests this remedy because Holdings' breaches resulted in a creditor of a trust that controls Holdings gaining voting control as well as legal and beneficial ownership of Holdings, which the anti-transfer provisions of the LLC Agreement were designed to prevent.

While admitting that it has breached the LLC Agreement, Holdings argues that extenuating circumstances counsel against a remedy depriving it of its status as a member. Holdings attempts to explain away its breaches as trifles resulting from exigent financial circumstances. Moreover, it advances the notion that if Eureka had fulfilled its duties under the LLC Agreement, it would have paid Holdings $13.2 million for its interest in Niagara Redevelopment when Holdings invoked the buy/sell provision of the LLC Agreement. Because of Eureka's breach of the buy/sell provision, Holdings contends that Eureka is in no position to call breach and deprive Holdings of its status a member.

In this opinion, I conclude that Holdings indisputably breached the LLC Agreement in at least four instances. Each of these breaches implicated a clear contractual goal of Eureka evinced in the LLC Agreement, which was to ensure that it would not find itself jointly owning Niagara Redevelopment with a partner it did not approve. By Holdings' breaches, Eureka found itself in the very position that the LLC Agreement's terms were designed to prevent—creditors of Holdings' owner claiming to be a 50% member of Niagara Redevelopment. As Eureka suggests, it is an entirely fitting and proportionate remedy to hold that Holdings, by virtue of these breaches, should be declared to have lost its status as a member and to be limited to the rights of an assignee as set forth in the

LLC Act. Therefore, I enter summary judgment for Eureka to that effect.

I also dismiss Holdings' counterclaims, largely for the following reasons. The first material breach of the LLC Agreement by Holdings predated its attempt to invoke the buy/sell provision. That material breach was undisclosed and gave the Cogan Trust's creditors a security interest in the Cogan Trust's controlling interest in Holdings. Therefore, Holdings was in no equitable position to invoke the buy/sell provision, having committed a prior material breach.

As important, Holdings claims that the financial straits of Cogan were so extreme that it was forced to breach the Agreement. This claim is at odds with Holdings' ability to follow through with its stated intent when it invoked the buy/sell provision, which was to buy out Eureka for $26 million. The record is devoid of proof that Holdings was ready, willing, and able to buy out Eureka at the price Holdings itself set. Rather, Holdings' invocation of the buy/sell provision was an exit ploy, used in the hope that Eureka would buy out Holdings. When Eureka indicated that it would, in fact, buy Holdings' interest but did not close on the deal, Holdings had only one contractual right—to buy out Eureka at 10% less than the original $26 million purchase price. Holdings never sought to specifically enforce its right to buy Eureka out at a 10% discount and has not proffered evidence that it was financially capable of exercising that right. To this day, approximately three years after Holdings' purported right to buy at the discounted price ripened, Holdings has never sought specific performance. Eureka's claim to enforce the buy/sell provision shall therefore be dismissed, given that: 1) Holdings had committed a prior, undisclosed material breach which disentitled it to invoke the buy/sell provision; 2) Hold-

ings did not have the financial resources to buy out Eureka when it first offered to do so nor when it had the chance to buy at a discount; and 3) Holdings never sought specific performance of its only contractual remedy.

## I. Factual Background

From the summary judgment record, the following undisputed facts emerge.

### A. Parties

Plaintiff Eureka is a single-purpose entity that was formed in 1998 by Howard and Edward Milstein, who are both New York real estate developers, to obtain a 50% membership interest in Niagara Redevelopment.

Defendant Holdings owned the remaining 50% membership interest in Niagara Redevelopment. Holdings was formed by Edwin Cogan, through a family trust (the "Cogan Trust"), who had been involved in other ventures to develop property in Niagara Falls, New York before entering into this joint venture with Eureka.

Niagara Redevelopment was formed by Eureka and Holdings for the purpose of developing certain properties in Niagara Falls. Holdings contributed the rights to develop those properties, and Eureka initially invested $4 million in Niagara Redevelopment in order to fund the development of the properties. The LLC Agreement names Eureka as the managing member of Niagara Redevelopment, and both Eureka and Holdings have equal voting and financial interests in Niagara Redevelopment.

### B. Cogan Obtains Development Rights In Niagara Falls And Brings Eureka Into The Deal

Beginning in 1996, Cogan began negotiating with the City of Niagara Falls and the Niagara Falls Urban Renewal Agency

(collectively, the "City") in an attempt to secure certain development rights in downtown Niagara Falls. Specifically, Cogan was seeking the rights to develop and manage a convention center and water amusement park and the rights to introduce legalized casino gambling into Niagara Falls. These negotiations culminated in June 1997 when Cogan secured a Master Redevelopment Agreement (the "Master Agreement") from the City.

Under the Master Agreement, Cogan obtained, on behalf of a company owned by him: (1) an eight-year option to purchase 142 acres of real estate in downtown Niagara Falls; (2) development rights for a water amusement park (the "Water Park"); (3) an option to purchase 20 acres of land for parking; and (4) an option to manage a 9,000 seat convention center. In addition, in May 1998, Cogan secured a five-year contract to manage the Niagara Falls International Airport.

Although Cogan received redevelopment rights under the Master Agreement, he did not have the financial resources to undertake the development envisioned by that Agreement. In August 1998, Cogan pitched his development plan to Howard and Edward Milstein, who were principals of a prominent real estate firm in New York City. The Milsteins agreed to become partners with Cogan.

To join up with each other, the Milsteins formed Eureka, and Cogan formed Holdings. Cogan's interest in Holdings was held by the Cogan Trust. Holdings and Eureka then became the two Class A Members of Niagara Redevelopment pursuant to an LLC Agreement executed on August 1, 1998. That LLC Agreement provided for Eureka and Holdings to each have a 50% entitlement to profits and a 50% voting percentage. Eureka also was named managing member, but Eureka was required to seek the approval of Holdings before undertaking the major decisions listed in § 3.2(c) of the LLC Agreement.

Although Eureka and Holdings had equal membership rights, each LLC member contributed a different type of value to Niagara Redevelopment. As is common with many types of joint ventures, one member brought to the table unique rights and skills necessary for the operation of the business, while the other member provided the financing that the other lacked. For his part, Cogan caused Holdings to transfer the interests in the Master Agreement and the interests in managing the airport, which were valued at $3 million for the purpose of quantifying each member's initial contribution, to Niagara Redevelopment. For its part, Eureka was "the money," and it contributed initial capital of $4 million.

## C. The Important Transfer Provisions Of The LLC Agreement

Because Cogan's personal know-how and involvement were important to the Milsteins' decision to invest in Niagara Redevelopment, the LLC Agreement contained a number of provisions designed to ensure that Eureka would be protected if Cogan ceased to have effective control of Holdings. These provisions, taken together, make clear that Eureka intended to be partners with Cogan, not strangers. Thus, in addition to detailing the management responsibilities and initial contributions of Eureka and Holdings, the LLC Agreement contains several provisions that restrict the transferability of Holdings' interest.

First, § 2.9 of the LLC Agreement requires that Holdings "shall at all times cause Edwin Cogan to maintain exclusive voting control (which control shall be exercisable without the consent or approval of any other Person) over the business and affairs of Holdings (and any transferee

permitted under the terms of this Agreement)." Section 2.9 then goes further and states that "Edwin Cogan's Family shall at all times own directly or indirectly and retain not less than fifty-one percent (51%) of the legal and beneficial ownership interests in Holdings (and any transferee permitted under the terms of this Agreement)."

In § 1.1, "Family" is defined, in pertinent part, as "trusts that are exclusively for the benefit of the named person and his or her family (as defined herein) (*provided,* that such trusts shall at all times (during his lifetime) be under the complete control and management of the named person [i.e., Edwin Cogan])." The clear import of § 2.9 and the definition of "Family" is that Cogan was to maintain voting control for Holdings' interest and that his Family, at all times, was to own a majority of Holdings' interest.

Section 9.1 of the LLC Agreement also restricts transfers. Under § 9.1(b), Holdings is not permitted to transfer any of its interest in Niagara Redevelopment "to a transferee that is not a member of the Edwin Cogan Family without the prior written consent of Eureka." A transfer is defined in § 1.1 as "any direct or indirect transfer, sale, pledge, hypothecation, encumbrance, conveyance, assignment, or other disposition of all or any portion of such [member's interest]," and an indirect transfer is defined as "a sale, pledge, hypothecation, encumbrance, conveyance, assignment, or other disposition of interests in a Person holding an [interest in Niagara Redevelopment]."

Further, § 9.1(c) states that, unless provided for in § 9.1(a)-(b), "no Member shall Transfer all or any portion of its Interest, or permit such a Transfer, without the prior written consent of a Majority–in–Interest of the Members.... Any purported Transfer in violation of this Article 9 shall be void *ab initio,* and shall not bind the Company." In addition, as to any transfer that was permitted or agreed to by the other party, § 9.2 states that no transfer would be binding on Niagara Redevelopment "unless and until a duplicate original of such assignment or instrument of transfer, duly executed and acknowledged by the assignor or transferor, has been delivered to [Niagara Redevelopment], and such instrument evidences . . . (iii) the consent to the Transfer of the Interest required pursuant to Section 9.1, if any."

### D. *Cogan's Bankruptcy*

Within a year of forming Niagara Redevelopment, it became clear why Cogan needed the financial backing of Eureka. In April 1999, a personal creditor of Cogan commenced bankruptcy proceedings against him in an Ontario bankruptcy court. In that bankruptcy, Cogan reported assets of $51,000 and liabilities in excess of $60 million. Rather than allowing the court to declare him bankrupt, Cogan worked out a plan of reorganization to satisfy his creditors.

At this time, the Cogan Trust still wholly-owned Holdings, which was a member of Niagara Redevelopment. Under his plan of reorganization, Cogan proposed to restructure the Cogan Trust's ownership of Holdings in the following manner: (1) 68% of Holdings would be owned by a new corporation, 83 Corp., and the shares of 83 Corp. would remain wholly-owned by the Cogan Trust; and (2) 32% of Holdings would be owned by another new corporation, 84 Corp., and the shares of 84 Corp. would be owned by Cogan's unsecured creditors. Through this plan, Cogan could help satisfy his creditors but maintain control of Holdings himself, because 83 Corp. would "remain wholly owned by the Cogan Trust, which would in turn retain control

over Holdings."[1] On July 16, 1999, the trustee in bankruptcy gave notice to Cogan's creditors that it would convene a July 29, 1999 meeting of creditors to consider the Restructuring Proposal.

At this point, a stark difference of opinion about the relevant facts emerges between Eureka and Holdings. Holdings' version of events goes like this. Holdings argues that on July 28, 1999—the day before the scheduled creditors' meeting—Cogan's attorney, Michael Gasch, contacted an attorney for Eureka, Jonathan Minikes, to obtain Eureka's approval of the restructuring. According to Holdings, during that conversation, "Minikes told Gasch that, in light of the Cogan Trust's retention of a 68% interest in Holdings under the [Restructuring] Proposal, Eureka's approval was not required."[2] Gasch also pledged to send to Minikes the materials that Cogan had shared with his creditors.

Eureka's version of events is quite different. According to Eureka, it never approved the Restructuring Proposal. In fact, Eureka says that it expressly refused to consent.[3]

### E. O'Shanter Secures A Lien On The Cogan Trust's Property

At the time he filed for bankruptcy, Cogan had a pre-existing relationship with O'Shanter Development Company Ltd. ("O'Shanter"). Shortly after concluding the bankruptcy proceeding, Cogan began discussing the proposed redevelopment of Niagara Falls with Jonathan Krehm, a principal of O'Shanter.

In the fall of 2001, Cogan approached Krehm and requested a loan from O'Shanter for $200,000. Krehm approved the loan, and O'Shanter entered into a Letter Agreement with the Cogan Trust as well as a General Security Agreement, which provided O'Shanter with a security interest in all of the Cogan Trust's "property and assets, real and personal, movable or immoveable, of whatsoever nature and kind." In the event of a default, O'Shanter was permitted to appoint a receiver to take possession of the pledged assets and to "carry on the business of the [Cogan Trust]."[4]

Even though the bankruptcy plan to split Holdings between 83 Corp. and 84 Corp. was approved in 1999, the Cogan Trust was still the sole owner of Holdings at the time the loan was received and the security interest was granted.[5] In the same month that the security interest was granted, the Cogan Trust promised that it would provide O'Shanter with "documentation establishing the position of the Borrower [i.e., the Cogan Trust] as the sole member of ... Holdings."[6] In that same document, O'Shanter acknowledged that the Cogan Trust might assign 68% and 32% of its interest in Holdings to 83 Corp. and 84 Corp. in the future.[7] As late as February 2003, documents proffered to the court by Holdings and signed by Edwin Cogan indicate that the Cogan Trust continued to be "the sole member of ... Holdings."[8] Therefore, by virtue of the General Security Agreement entered into with O'Shanter in October 2001, the Cogan Trust granted an "encumbrance" against

---

1. Holdings' Ans. Br. 5.

2. *Id.* at 6 (citing Gasch Aff. ¶ 7).

3. Bergamo Aff. ¶ 17.

4. Krehm Aff. Ex. 2.

5. Krehm Aff. Ex. 1.

6. *Id.*

7. *Id.*

8. Krehm Aff. Ex. 5

its ownership interest in Holdings without the consent of Eureka.

After the initial loan agreement in October 2001, Edwin Cogan deepened O'Shanter's claim on the Cogan Trust, and therefore Holdings, by borrowing further funds. In all, O'Shanter ended up loaning the Cogan Trust over $700,000. The interest terms in the October 2001 loan agreement suggest how insolvent Cogan was: the annual interest rate was 18% with the possibility of increasing to 25%.[9]

### F.   *Holdings Triggers The Buy/Sell Provisions Of The LLC Agreement*

During the summer of 2002, Cogan began considering another way to extricate himself from his financial mess—causing Holdings' to sell its interest in Eureka. To that end, he began negotiating the terms of a withdrawal with Eureka. But these negotiations failed.

In the wake of that failure, Cogan decided to cause Holdings to use a possible exit mechanism provided for in § 9.6 of the LLC Agreement. I will refer to the mechanism in § 9.6 as the "Buy/Sell Provision." The Buy/Sell Provision provides that:

> (a) Either Eureka . . . or Holdings . . . (the "Offeror"), may give to the other (the "Offeree") a notice (a "Buyout Notice") stating that the Offeror . . . desires to purchase the Interest(s) of the Offeree and stating the price (the "Buyout Price"), and stating that the Offeror will either (i) pay to the Offeree in exchange for the Offeree's entire Membership Interest(s) in the Company . . . or (ii) sell the Offeror's entire Membership Interest(s) in the Company to the Offeree . . . .

> (b) The Offeree shall have a period of 30 days after the receipt of a Buyout Notice within which to notify the Offeror (the "Reply Notice") whether the Offeree shall (A) sell its Membership Interest(s) . . . or (B) buy the Offeror's Membership Interest(s) in the Company for the Selling Amount.

On November 7, 2002, Holdings notified Eureka that it intended to purchase Eureka's interest in Niagara Redevelopment in accordance with § 9.6(a). Holdings, pursuant to § 9.6(a), set the purchase price, which it determined to be $39.2 million. That price consisted of an offer of $26 million for Eureka's membership interest and a value of $13.2 million for Holdings' membership interest. In other words, Holdings was offering Eureka $26 million for its membership interest in Niagara Redevelopment.

Despite a specific request to Holdings, there is no evidence in the record that it had the resources to consummate the offer it purported to make to Eureka. Indeed, all of its arguments to this court, and the course of dealings between the Cogan Trust and O'Shanter, as well as Cogan's admissions in the bankruptcy process, indicate that Holdings did not have the wherewithal to carry through with a purchase.

In response to Holdings' putative offer, as Holdings likely expected, Eureka sent a letter to Holdings' counsel on December 6, 2002, which stated that Eureka was exercising its option under § 9.6(b) to purchase Holdings' membership interest for the $13.2 million selling amount. By virtue of Eureka's response, in Holdings' own words, "Holdings became the Selling Member and Eureka became the Purchasing Member under Sections 9.6 and 9.7 . . . ."[10] Eureka's letter set a closing date of no later than March 7, 2003, which

---

9.   Krehm Aff. Ex. 1.

10.   Eagle Decl. ¶ 4.

was the last day that closing could occur under § 9.7(c) of the LLC Agreement. After responding, Eureka allegedly stopped sending Holdings financial information for Niagara Redevelopment.

Once he believed Eureka would buy out Holdings, Cogan again contacted his friend Krehm at O'Shanter and requested that O'Shanter lend the Cogan Trust more funds. In anticipation of Eureka buying Holdings' interest, O'Shanter granted a loan in the amount of $250,000 to the Cogan Trust on February 3, 2003. In fact, O'Shanter set the maturity date on the loan as the expected closing date, March 7.

As of March 5, though, Holdings had not heard from Eureka about the closing, which prompted Gasch, Holdings' counsel, to fax a letter to Eureka requesting preclosing documents. The next day, Gasch sent certain information to Eureka, including a signed assignment of Holdings' membership interest in Niagara Redevelopment to be held in escrow until Eureka funded the buyout. On March 7, Cogan and O'Shanter were to be disappointed— Eureka did not close.

Holdings, then, opted to take advantage of § 9.7(i) of the LLC Agreement, specifically § 9.7(i)(iii)(x), which provides that:

*Should either Eureka or Holdings default in its obligations under Section 9.6 or Section 9.7 after the determination . . . that one party shall be a Selling Member and the other party shall be the Purchasing Member,* (i) the defaulting Member shall have no further right to invoke the provisions of Section 9.6 . . . and (iii)(x) *the non-defaulting Member may buy the defaulting Member's Membership Interest(s) on the same terms or conditions as determined pursuant to*

*Section 9.6, except that in such event the Buyout Price shall be reduced by 10%,* or (y) if the non-defaulting Member is the Purchasing Member, it shall be entitled to specific performance.[11]

Holdings—as the non-defaulting Member who was the Selling Member—informed Eureka on June 17, 2003 that it would be purchasing Eureka's membership interest at the 10% haircut described in § 9.7(i)(iii)(x).[12] Under the terms of the LLC Agreement, closing could occur no later than September 16, 2003.

At the court's request, Holdings purported to provide evidence of financing that it had in place when it attempted to initiate a § 9.7(i) default buyout of Eureka's interest. Interestingly, Holdings itself never sought financing to purchase Eureka's interest. Rather, the documents produced by Holdings indicate that it sought to sell its interest along with Eureka's. In fact, Holdings (or more appropriately Cogan) negotiated with two potential purchasers of Niagara Redevelopment.[13] The first potential purchaser was BBC Entertainment, Inc. Holdings provided to the court a draft Letter Agreement between BBC Entertainment and Holdings, in which BBC Entertainment offers to acquire Niagara Redevelopment for $61 million.[14] Of that $61 million, Eureka would have received $32 million, Holdings would have received $14 million, and the remaining $15 million would have been used to exercise Niagara Redevelopment's right to acquire an interest in the Water Park. This, then, would have allowed Holdings to still receive the cash it expected to receive in a buyout by Eureka, but the mechanism would be different.

---

11. Emphasis added.

12. Krehm Aff. Ex. 14.

13. Declaration of Eagle at 4–5.

14. *Id.* at Ex. B.

Cogan, though, apparently was not committed fully to the BBC Entertainment transaction. At some point in July 2003, Cogan began negotiating with two other individuals, Mel Harris and Nasser Kazeminy, who were interested in purchasing Eureka's interest and who would allow Cogan himself to retain an interest in Niagara Redevelopment. Cogan, Harris, and Kazeminy (the "Investor Group") entered into a Term Sheet that contemplated that those three individuals would "form a venture for the acquisition of all of the interests in" Niagara Redevelopment.[15] Under this Term Sheet, Harris and Kazeminy would contribute $5 million each, and at closing, Cogan would receive $3 million in cash and an $11 million preferred interest in Niagara Redevelopment. Each member of the Investor Group would own one-third of Niagara Redevelopment. The Term Sheet also indicated that "Milstein has tentatively agreed that he will sell his total interest in [Niagara Redevelopment] for $35 million in cash plus some form of future participation entitlement."[16] Therefore, the Investor Group would be required to shell out $38 million at closing—$35 million for Eureka and $3 million for Cogan himself.

Unlike the deal with BBC Entertainment, which involved a commitment from BBC Entertainment to fund the $61 million purchase of Niagara Redevelopment, the Term Sheet stated that "Harris and Kazeminy shall provide, within 5 business days of the execution of this Term Sheet: (a) A letter from a major bank evidencing the immediate availability of $35 million to purchase the Milstein interest."[17] Harris and Kazeminy signed the Term Sheet at some point in July 2003, but the Term Sheet was then revised in August. Only Cogan signed the revised Term Sheet. In addition, Holdings provided no evidence in the record that such a letter of financing was ever obtained nor did Holdings even indicate if any bank was approached to provide the financing.

In a letter written on September 11, 2003, Holdings indicated that at some point Milstein became unresponsive in negotiations, and Holdings proposed that closing occur on September 16. Yet, Holdings does not specify in this letter which of the two transactions, the BBC Entertainment buyout or the Investor Group buyout, would be occurring. Closing did not occur by September 16, 2003.

The bottom line, though, is clear. Holdings did not have the capacity to buy out Eureka when it made its initial offer on November 7, 2002. Nor did Holdings have the capacity to buy out Eureka when Holdings exercised its option to buy out Eureka at the 10% haircut provided in § 9.7(i)(iii)(x). The only evidence in the record is that Holdings scrambled around trying to conjure up a different deal at the second stage; there is no evidence that Holdings was capable of completing its initial offer at the 10% discount. That is, at the second stage, there is no evidence that Holdings had the wherewithal to pay Eureka the specific amount required—$26 million minus 10%—or to secure financing for that amount. That Holdings dithered around with other deal structures is immaterial. What is important is whether there is record evidence that it was capable of consummating the transactions contemplated by its offers under § 9.6 and 9.7. On this record, there is no triable doubt that Holdings was incapable of doing that.

From September 16, 2003, the date Eureka allegedly failed to allow Holdings

**15.** *Id.* at Ex. F.

**16.** *Id.*

**17.** *Id.*

to buy out its interest, to this date, nearly three years later, Holdings has never sought specific performance of its right to buy out Eureka at the 10% discount pursuant to § 9.7(i)(iii)(x).

## G. *Niagara Redevelopment Renegotiates With The City*

Against the backdrop of the Buy/Sell drama, Niagara Redevelopment also was involved in a dispute with the City concerning Niagara Redevelopment's obligation to purchase the Water Park. In fact, twelve days after Eureka's initial failure to close the buyout in March, Eureka sent Gasch a letter informing him about this dispute. The problem apparently arose because Eureka caused Niagara Development to allow another company, Fallsite Ltd., to exercise certain rights that would allow it, not Niagara Redevelopment, to acquire the Water Park. Eureka sent a letter on June 9, 2003 to inform Holdings of these issues. This was approximately one week before Holdings attempted a default buyout of Eureka's interest in Niagara Redevelopment.

Later in June, Eureka, as managing member of Niagara Redevelopment, entered into a Settlement Agreement with the City in order to resolve the dispute. Pursuant to this Settlement Agreement, Niagara Redevelopment and the City entered into a Development Agreement on June 25, 2003. The Development Agreement terminated the original Master Agreement that Cogan secured in 1997. Under the Development Agreement, Niagara Redevelopment committed to invest at least $110 million for various real estate development projects, and the City agreed to sell certain property to Niagara Redevelopment at 1997 values. Niagara Redevelopment also agreed to pay a $1 million premium in the aggregate for all the prop-

erties the City agreed to sell. In the event that the Development Agreement was terminated, the City was permitted to force Niagara Redevelopment to reconvey the properties to the City at the price that Niagara Redevelopment paid, and Niagara Redevelopment would forfeit half of the $1 million premium.

The Development Agreement also provided, presumably in response to the Water Park issue, that Niagara Redevelopment was not permitted to sell or assign any of its rights. But, apparently the transaction with Fallsite was not covered under the Development Agreement because on July 18, Eureka stated in a letter that "[Niagara Redevelopment] does not have title to the [Water] Park." Later, during the course of this litigation, Eureka confirmed that Niagara Redevelopment merely has an interest in the Water Park but did not elaborate on the nature of that interest. Although there was this uncertainty, there was no doubt that Eureka had continued to play its role as "the money." In fact, Eureka has invested approximately $32 million in Niagara Redevelopment to date.[18]

So, as of the end of September 2003, neither Eureka nor Holdings had bought the interest of the other; Eureka had invested a great deal of cash in Niagara Redevelopment, the Master Agreement was replaced by the Development Agreement; and there was uncertainty about Niagara Redevelopment's interest in the Water Park.

## H. *Cogan Dies And A Receiver Takes Control Of Holdings*

On October 16, 2003, Cogan died unexpectedly. A meeting was held in November 2003 to discuss Cogan's estate. Cogan's attorneys, executors, family

18. Bergamo Aff. ¶ 9.

members, and Krehm of O'Shanter attended. At that meeting, all three of Cogan's named executors, including one of his children, renounced their positions because of Cogan's extensive debts. As a result, Cogan's estate has not been probated.

Cogan's death combined with the executors' renunciation to create uncertainty about who was going to assume responsibility for managing Holdings. At this point, Cogan's son Nick consulted with Krehm about the fate of Holdings. Krehm had an interest in seeing Holdings realize value because all of O'Shanter's loans to the Cogan Trust were in default, and the security interest in the Cogan Trust applied to Holdings, which was wholly-owned by the Cogan Trust when O'Shanter received its security interest. O'Shanter, then, took advantage of the receivership remedy outlined in its General Security Agreement with the Cogan Trust. On July 21, 2004, over nine months after Cogan's death, O'Shanter appointed Wellervest, Inc. as receiver for the assets of the Cogan Trust. By this time, the ownership of Holdings finally had been split among 83 Corp. and 84 Corp.

Therefore, when Wellervest took control of the Cogan Trust, it became the legal owner of 100% of the shares of 83 Corp., which was the 68% owner of Holdings. Wellervest then named Krehm as the sole director and president of 83 Corp., which effectively gave him control of Holdings. Then, pursuant to Schedule 3.3 to the LLC Agreement, which provided that Edwin Cogan would be "vested with the authority of Holdings, until such time, as any, as Eureka shall receive a notice from Holdings designating one or more new representatives," Krehm caused Holdings to name Nick as the new representative for Holdings.[19]

Nick advised Eureka in September 2004 that he would serve as the new representative of Holdings. Eureka was skeptical as to who was appropriately designated to serve as the representative, having been contacted by multiple people claiming to act on behalf of Cogan's estate, and stated that Eureka would only accept the appointment of a new representative if it was reflected by a court order. In fact, Eureka originally brought this lawsuit in order to compel Holdings to identify a successor representative but then amended its complaint once it received evidence that Holdings breached certain provisions of the LLC Agreement.

## II. *The Procedural Posture Of The Case*

This dispute is before me now on Eureka's motion for summary judgment, which seeks a declaration that Eureka is the sole member of Niagara Redevelopment and the dismissal of Holdings' counterclaims.

Eureka's motion for summary judgment will be granted only if no genuine issue of material fact exists and it can show that it is entitled to judgment as a matter of law.[20] In deciding this motion, I must construe the facts in the light most favorable to Holdings, and Eureka must demonstrate that there is no issue of material fact.[21]

19. Apparently, naming Nick as the new Holdings representative was supposed to give Eureka comfort, as Holdings now leans on the notion that Nick is a member of the Cogan Family and a proverbial "chip off the old block." But, at the same time, Holdings argues that "[n]either Nick Cogan nor his family members had the expertise or the resources to co-manage Holdings...." Holdings' Ans. Br. at 12.

20. *E.g., Acro Extrusion Corp. v. Cunningham,* 810 A.2d 345, 347 (Del.2002).

21. *E.g., American Legacy Found. v. Lorillard Tobacco Co.,* 886 A.2d 1, 18 (Del.Ch.2005).

■ This summary judgment motion, initially, turns on whether Holdings breached the LLC Agreement. That question largely hinges on the unambiguous language of the Agreement itself.[22] That is not the end of this dispute, though, because Eureka seeks a remedy that is not provided for in the LLC Agreement itself—a loss of Holdings' membership rights. If a contract or agreement is silent as to the remedy for a breach, the "Court of Chancery has the discretion to award any form of legal and/or equitable relief and is not limited to awarding contract damages for breach of the agreement."[23] Therefore, after determining whether Holdings breached the LLC Agreement, I will determine whether Eureka is entitled to the remedy it seeks, i.e., a declaration that it is the sole member of Niagara Redevelopment.

### III. The Claims Of The Parties In The Operative Pleadings

Eureka's amended complaint contains only one count—a request for a declaratory judgment that Eureka is now the sole member of Niagara Redevelopment as a result of Holdings' breaches of the LLC Agreement. Eureka premises its request for relief on an assertion that Holdings has committed four distinct breaches of the LLC Agreement: 1) a breach of § 9.1(b) by transferring a 32% interest in Holdings to 84 Corp., which was not controlled by the Cogan Family, in Cogan's bankruptcy reorganization and a breach of § 9.2 by failing to submit a duplicate original of this transfer to Niagara Redevelopment (the

"Bankruptcy Breach"); 2) a breach of § 9.1(b) by allowing O'Shanter to obtain a security interest in Holdings by means of granting a security interest in all property then owned by the Cogan Trust and a breach of § 9.2 by failing to submit a duplicate original of this security interest, which constituted an indirect transfer, to Niagara Redevelopment (the "Security Interest Breach"); 3) a breach of § 2.9 resulting from Cogan's death, which rendered him unable to maintain exclusive voting control of Holdings (the "Voting Control Breach"); and 4) a breach of § 2.9 by permitting a receiver to take control of the Cogan Trust, which left the Cogan Family with less than 51% of the legal and beneficial ownership of Holdings as required by § 2.9 (the "Receiver Breach").

Holdings now concedes two of these breaches, the Security Interest and Voting Control Breaches, but it contends that the other two breaches alleged by Eureka are not breaches at all. Most important, Holdings argues that Eureka's proposed remedy is too harsh and that Eureka should tolerate having O'Shanter (controller of Holdings) effectively become its new co-equal member in Niagara Development. Apparently, Holdings views its prior breaches as having caused no harm and therefore as giving rise to no material remedy for Eureka. Not only that, Holdings seeks to go on the offensive.

It seeks two alternative forms of relief. First, Holdings alleges that Eureka breached § 9.7 when it failed to buy out Holdings on March 7, 2003. As a remedy, Holdings seeks to recover the $13.2 million

**22.** See *Pellaton v. The Bank of New York*, 592 A.2d 473, 478 (Del.1991).

**23.** *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del.2002) (discussing the Court of Chancery's discretion when a partnership agreement was silent as to remedies for breach); *see also Universal*

*Studios, Inc. v. Viacom, Inc.*, 705 A.2d 579, 583 (Del.Ch.1997) (stating that "when the parties' agreements have been breached but neither the innocent party nor the venture suffers immediate quantifiable harm, the equitable powers of this Court afford me broad discretion in fashioning appropriate relief").

it would have received had Eureka followed through with the buyout, plus interest. Notably, Holdings does not seek specific performance of its right to buy out Eureka at the 10% discount price provided for in § 9.7(i)(iii)(x). In the alternative, Holdings seeks dissolution of Niagara Redevelopment because Eureka and Holdings cannot work together cooperatively, and therefore, it is not practicable for Niagara Redevelopment to continue.

I will first address the alleged breaches of the LLC Agreement that Holdings contests: the so-called Bankruptcy and Receiver Breaches. I will then discuss the two uncontested breaches, the Security Interest and Voting Control Breaches, committed by Holdings.

### A. Did Holdings Breach The LLC Agreement By Transferring A 32% Interest To 84 Corp.?

A head-hurting amount of argument has centered on whether Holdings breached the LLC Agreement by ultimately implementing its Restructuring Proposal. In that Proposal, Cogan's unsecured creditors were to receive a 32% interest in Holdings through a newly-formed corporation, 84 Corp. That interest would be transferred from the Cogan Trust to the creditors. The remaining 68% interest in Holdings owned by the Cogan Trust was to be transferred to 83 Corp., which the Cogan Trust would own.

There is no doubt that this proposed reorganization involved an indirect transfer under § 9.1(b) of the LLC Agreement, which is defined as any "sale, pledge, hypothecation, encumbrance, conveyance, assignment or other disposition of interests in a Person holding an Interest." Section 9.1(b), then, requires Eureka to consent, in writing, to that transfer. But, Eureka never gave its written consent. Rather, Holdings argues that Eureka's counsel Minikes indicated that no such consent was required. As Holdings itself argues, the reason that Minikes gave for taking that alleged position (a position Eureka denies he took) was that "the 1990 Cogan Family Trust retained a 68% interest in Niagara Falls Holdings, LLC." [24]

The interesting legal question that I need not and do not address is the consequence if Minikes actually made the statement Holdings attributes to him. [25] Section 12.11 of the LLC Agreement says that "this Agreement may not be amended or supplemented, and no provisions hereof may be modified or waived, except by an instrument in writing signed by each of the Members." Eureka then also cites § 9.2, which specifically states that "[n]o Transfer of all or any part of the Interest of a Member permitted to be made under this Agreement shall be binding on the Company unless and until a duplicate original of such assignment or instrument of transfer ... has been delivered to the Company and such instrument evidences ... the

---

**24.** Gasch Aff. ¶ 7; *see also* Holdings' Ans. Br. at 5–6.

**25.** The parties frame this issue as one of waiver, but it might more aptly be thought an issue of equitable estoppel. That is, it is not clear to me that Eureka interpreted the contract to require its consent in this instance and then waived that requirement. Rather, it appears as though, based upon Holdings' allegations, Eureka misinterpreted the contract as not requiring its consent. That, then,

could constitute an instance where "a party may be precluded by its own act or omission from asserting a right to which it *otherwise would have been entitled* ...." *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del.2000). Here, Eureka was entitled to prevent this transfer without its consent, but an authorized statement by its agent that its consent was not required might preclude it from enforcing this right.

consent to the Transfer of the Interest required pursuant to Section 9.1, if any."

For two independent reasons, Eureka contends that the transfer of the 32% interest in Holdings to Cogan's creditors was not effective. First, Eureka claims that the LLC Agreement's own terms prevent Minikes' statement from having any legal dignity. If Holdings wanted a waiver of the need for consent from Eureka, it was bound to obtain that in writing pursuant to § 12.11. Second, Eureka claims—without opposition—that Holdings never delivered the duplicate original of the instrument of transfer to Niagara Redevelopment as required by § 9.2.

I elide the first issue here. The law has long struggled with the question of whether a contractual provision requiring written modifications or waivers can itself be modified by the oral statements or conduct of a party. Despite the efficiency of a judicial rule giving strict effect to such

provisions, Holdings is able to cite to venerable authority taking a less rigid approach and permitting oral modifications and waivers when sufficient proof is submitted to the court.[26] One can colorably take the view that this jurisprudence has resulted in a rule in Delaware that looks with disfavor on, but does not foreclose entirely, claims that, irrespective of a clear contractual provision requiring that waivers or modifications be made in writing, a waiver or modification was effected by oral statements or conduct. To deal with the cognitive dissonance such claims create and the intrusion they make on the reliability of written contracts, our law has embraced a handy tool of the common law jurist: the ability to increase the level of proof the plaintiff must submit in order to prevail. Arguably, our law has done that in this area by upping that level of proof from a mere preponderance to clear and convincing evidence,[27] a move that also has

---

**26.** *See* 3A CORBIN ON CONTRACTS § 763, at 531 (1960) ("An express provision in a written contract that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary. In like manner, a provision that an express condition or a promise or promises in the contract can not be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective. The promisor still has the power to waive the condition. . . ."); RICHARD A. LORD, 13 WILLISTON ON CONTRACTS § 39:26 (4th ed. 2004) ("It is well settled that a party to a written contract may orally, or by implication from conduct, waive performance of a contract term or condition inserted in the contract for his or her benefit, and the waiver does not require a writing."). Justice, then Judge, Cardozo stated the proposition in quite sensible language: "Those who make a contract may unmake it. The clause which forbids a change may be changed like any other. The prohibition of oral waiver may itself be waived." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 122 N.E. 378, 381 (1919). *See also Honeywell Int'l Inc. v. Air Products & Chemicals, Inc.*, 872 A.2d 944, 954–56 (Del.2005) (applying New York law and determining that the conduct of the par-

ties was sufficient to modify an agreement, even though the agreement required modifications to be in writing). Eureka, though, cites an opinion of this court, *Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219 (Del.Ch. 2000), for the proposition that when parties agree that modifications must be in writing, in the absence of a writing, "the Court will not recognize the unwritten alleged amendment to the Agreement." *Id.* at 1229. Unlike in *Continental*, though, Holdings is not alleging that it and Eureka agreed to amend or modify the LLC Agreement. Rather, Holdings claimed that Eureka waived the requirement that it consent to a specific transfer. The issue, then, is not one of modification but of waiver. In *Continental*, the court stated that "it is settled law that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision." *Id.* If a provision requiring written modifications can be waived orally, then, it stands to reason that a provision requiring written waiver can be waived orally.

**27.** *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del.2005)

been made in situations when a party seeks to prove the existence of a partially performed oral contract in derogation of the statute of frauds.[28]

■ I do not venture further into this thicket because it is not necessary. Two other grounds exist to demonstrate that Holdings violated the LLC Agreement when the Cogan Trust transferred 32% of its interest in Holdings to Cogan's creditors.

The most obvious is that Holdings did not comply with § 9.2. In the face of argument by Eureka, Holdings has failed to produce any evidence that it ever provided Niagara Redevelopment with "a duplicate original" of any "assignment or instrument of transfer" to 83 Corp. or 84 Corp.[29] As has been shown previously and will be discussed more, Holdings did not actually effect the transfer of the Cogan Trust's 32% interest in Holdings to Cogan's creditors until sometime after February 2003. The precise manner in which that occurred still remains unclear. By the plain terms of § 9.2, the failure of Holdings to provide a copy of the assignment or instrument of

transfer results in that transfer not becoming binding on Niagara Redevelopment.[30]

The other ground for ruling for Eureka rests in the conditional nature of Minikes' alleged approval of the Restructuring Proposal. In its brief, Holdings argues that Minikes waived Eureka's right to consent because "[t]he shares of [83 Corp.] would remain wholly owned by the Cogan Trust, which would in turn retain control over Holdings ... [and] in light of the Cogan Trust's retention of a 68% interest in Holdings under the [Restructuring] Proposal."[31] That is, Eureka consented, if at all, to a scenario where Cogan was granting a minority interest in Holdings to his creditors and leaving the majority interest unencumbered and owned by the Cogan Trust. But we now know that Cogan did not in fact maintain the Cogan Trust's unilateral control over Holdings. Rather, Cogan, without notice to or approval by Eureka, soon gave O'Shanter a security interest in and the ultimate ability to control Holdings. Putting aside whether the thin evidence in the record regarding Minikes' statements would ever rise to the high level required to prove an oral waiver

---

(stating that "the standards for proving waiver under Delaware law are quite exacting") (internal citations omitted); *see also George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del.1975). The exact burden of proof required to support a finding of waiver is somewhat of an apparition. As mentioned, *Aero-Global* and prior cases speak of the burden as "quite exacting." *See AeroGlobal*, 871 A.2d at 444; *see also Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270, 1289 (Del. 1994). Our courts also have stated that the intent to prove waiver must be supported by clear evidence. *George*, 334 A.2d at 224; *Hirzel v. Silker*, 156 A. 360, 362 (Del.1930). More helpfully, and, shall we dare say more clearly, we have occasionally discussed proving waiver in terms of a more specific and well-understood burden of persuasion—that of clear and convincing evidence. *See Ballenger v. Applied Digital Solutions, Inc.*, 2002 WL 749162, at *8 (Del.Ch. Apr. 24, 2002); *Zaret v.*

*Warners Moving & Storage*, 1995 WL 56708, at *1 (Del.Ch. Feb. 3, 1995) (discussing waiver of arbitration only); *Egan & Sons Air Conditioning Co. v. General Motors Corp.*, 1988 WL 47314, at *9 (Del.Super. Apr. 27, 1988).

**28.** *See Shepherd v. Mazzetti*, 545 A.2d 621, 623 (Del.1988) (stating that "a partly performed oral contract may be enforced by an order for specific performance upon proof by clear and convincing evidence of actual part performance"); *Bielo v. Delaware Wild Lands, Inc.*, 1995 WL 106302, at *5 (Del.Ch. Feb.8, 1995) (same).

**29.** LLC Agmt. § 9.2.

**30.** At oral argument, Holdings eventually conceded this breach. Tr. 68.

**31.** Holdings Ans. Br. at 5–6.

of a contract requiring written waivers, what is critical is that Holdings clearly extracted whatever assent Minikes gave on the basis that Eureka's desired partner, Cogan, would maintain singular control of Holdings through the Cogan Trust. Before the Restructuring Proposal was implemented, Cogan violated that premise, thereby vitiating Holdings' ability to rely on the supposed waiver of Minikes.

Therefore, I conclude that there is no triable issue of fact regarding whether Holdings violated the LLC Agreement by eventually implementing the Restructuring Proposal.

## B. Did Holdings Breach The LLC Agreement When A Receiver Was Appointed For Niagara Redevelopment?

■ The second alleged breach that Holdings contests, the Receiver Breach, involves the issue of whether the LLC Agreement was breached by virtue of Wellervest acquiring control of Holdings. Holdings' argument has no force. Under § 2.9, the Cogan Family was required to "at all times own directly or indirectly and retain not less than fifty-one percent (51%) of the legal and beneficial ownership interests in Holdings." Cogan Family is defined, in pertinent part, in the LLC Agreement as "corporations, limited liability companies or partnerships exclusively owned, managed and controlled by the named person or his family . . . or trusts that are exclusively for the benefit of the named person and his or her family . . . (provided, that such trusts shall at all times (during his lifetime) be under the complete control and management of the named person)."

O'Shanter appointed Wellervest as receiver by exercising its security interest in the Cogan Trust and seizing on its assets, including its shares of 83 Corp. By its own notice, Wellervest declared that it had taken "possession and control" of the "property of the Cogan Trust" on July 21, 2004. Therefore, at the very least, beneficial ownership, if not actual legal ownership, of the shares of 83 Corp. is now indisputably in the hands of Wellervest and not of the Cogan Family. Section 2.9 clearly requires the Cogan Family to retain at least 51% ownership of Holdings "at all times." Because Wellervest now "possess[es] and controls" the property of the Cogan Trust, § 2.9 was indisputably breached.[32] Because the appointment of Wellervest clearly breached § 2.9, I need not and do not reach Eureka's argument that the appointment required its prior written approval under § 9.1.

## C. Holdings Concedes The Security Interest Breach And The Voting Control Breach

Despite contesting the alleged Bankruptcy and Receiver Breaches, Holdings has now conceded that it twice breached the LLC Agreement.[33] The first conceded breach is the Security Interest Breach, and the second conceded breach is the Voting Control Breach. The Security Interest Breach occurred in October 2001, when the Cogan Trust, then the sole owner of Holdings, pledged all of its property as a security interest for a loan provided by O'Shanter. The Voting Control Breach occurred when Cogan died in October 2003. Those two occurrences, respectively, constituted breaches of § 9.1(b) and § 2.9 of the LLC Agreement.

---

**32.** Holdings also argues that Wellervest's appointment was provisional, not permanent, but that does not matter under the terms of § 2.9. That section requires that the Cogan Family own 51% of Holdings "at all times," not at all times except the temporary period when it is owned and controlled by a receiver.

**33.** Tr. 67–68.

Holdings' own submissions in the summary judgment record reflect that, despite the alleged acceptance by the Ontario bankruptcy court of the Restructuring Proposal, as of October 18, 2001, the Cogan Trust was still the sole member of Holdings.[34] Indeed, O'Shanter clearly premised its decision to lend to the Cogan Trust on its ability, as a lender, to protect itself by seizing on the Trust's controlling interest in Holdings. The loan agreement between O'Shanter and the Cogan Trust requires explicitly that the Cogan Trust provide "documentation establishing the position of the [Cogan Trust] as the sole member of Niagara Falls Holdings LLC."[35] Given that the Cogan Trust still wholly owned Holdings, the security interest granted to O'Shanter clearly constituted an indirect transfer under § 9.1(b) of the LLC Agreement because it "encumber[ed] the interests of a "person" (i.e., the Cogan Trust) holding an "Interest" (i.e., that of Holdings) in Niagara Redevelopment." Given that this constituted a transfer, Holdings also breached § 9.2 by failing to record the transfer with Niagara Redevelopment.

The encumbrance granted to O'Shanter, of course, paved the way for the receivership of the Cogan Trust in July 2004, which effectively transferred control of Holdings to a creditor of the Cogan Trust. The end result of this breach, then, was a stranger occupying a position of control over Holdings, the very result that the LLC Agreement contained multiple provisions to prevent.

Furthermore, the failure of Cogan to disclose that the Cogan Trust was granting O'Shanter a security interest in its interest in Holdings had the effect of deceiving Eureka, even if Holdings' position regarding Minikes' statements about the Restructuring Proposal were true. Rather than Cogan limiting his creditors to having an interest in a minority, non-controlling position in Holdings, Cogan had secretly granted his creditors a security interest in all of the Cogan Trust's assets—i.e., in 100% of Holdings. Instead of having as its de facto partner someone who, although deeply insolvent, had solved his financial woes in a manner that did not compromise his ability to maintain exclusive control of Holdings, Eureka had a de facto partner who, because of his enormous personal debts, covertly placed his creditors in effective control of Holdings. Stated simply, if Holdings sought approval from Eureka for the Restructuring Proposal on the basis it asserts that it did, then the subsequent, undisclosed grant of the security interest to O'Shanter in October 2001 was made in bad faith and deprived Eureka of its reasonable expectations as a contractual partner.[36]

The second undisputed breach of the LLC Agreement, the Voting Control Breach, occurred when Edwin Cogan died in October 2003. As oddly awkward as it is that this personal misfortune constitutes a breach of the LLC Agreement, the Agreement clearly contemplated and addressed with clarity the possibility of Cogan's death. Section 2.9 requires Holdings to:

> at all times cause Edwin Cogan to maintain exclusive voting control (which shall be exercisable without the consent or

---

**34.** Krehm Aff. Ex. 1. This loan agreement contemplates the transfer of the Cogan Trust's interest in Holdings to 83 Corp. and 84 Corp., but it had not occurred as of the time the loan and accompanying security interest were granted.

**35.** *Id.*

**36.** *E.g., Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns. Corp.,* 1991 WL 277613, at *3 (Del.Ch. Dec. 30, 1991).

approval of any other Person) over the business and affairs of Holdings.... Any breach of the terms of this Section 2.9 ... shall be deemed a failure by Holdings to comply with a material provision of this Agreement; *provided that a breach of the terms of this Section caused solely by the death of Edwin Cogan shall not entitle Eureka to any claim for damages caused directly thereby.*[37]

Cogan's death, then, was expressly stipulated to be a breach of the LLC Agreement. This unusual provision makes obvious the materiality to Eureka of assuring that its business partner would effectively be Cogan and no one else. It is equally as obvious from § 2.9 that Eureka contracted for an assurance that it would not end up with a stranger as a partner, much less with a stranger that would be a creditor of Cogan.

■ Having found four clear breaches of the LLC Agreement, I will now address the question of whether Eureka should receive its preferred remedy.[38]

### IV. *Eureka's Suggested Remedy Is Equitable And Proportionate*

■ Holdings finds itself in the odd position of admitting that it is in material breach of the LLC Agreement but that it should be excused on the ground that its breaches caused no harm. In essence, Holdings believes that it is no big deal for Eureka to have to deal with O'Shanter as its new de facto partner, even though the LLC Agreement clearly evinces Eureka's contractual intent to avoid having a fellow member not of its own choosing with important control rights. To that point, it is difficult to imagine a more direct contractual indication that it was critical for a member to remain controlled by a particular person than § 2.9, which indicated that the death of Edwin Cogan would constitute a breach.

Moreover, Holdings slights the fact that O'Shanter's own objectives—to secure repayment of its loans to the Cogan Trust at the usurious interest rates it charged by causing Niagara Redevelopment to dissolve or Eureka to buy out Holdings—illustrate why a commercial party like Eureka, who is investing tens of millions of dollars in a risky, long-term project would reasonably want to control who becomes its fellow member. Indeed, it is difficult to find a more quintessential example of why an LLC member would wish to control the

---

37. Emphasis added.

38. Holdings has raised the equitable defense of laches to the breaches. This defense does not raise a triable issue of fact precluding summary judgment and does not warrant extended discussion. There is no evidence that Holdings was aware of Cogan's grant of a security interest to O'Shanter until after Wellervest took control of the Cogan Trust. Moreover, Holdings' argument that Eureka knew of Cogan's financial straits and therefore should have assumed Cogan and the entities he controlled would violate the LLC Agreement is, to put it mildly, a strange and unconvincing one. Knowing that someone has financial troubles is not equivalent to having inquiry notice that that person will violate his legal obligations. The fact that Cogan filed bankruptcy in 1999 and sought loans from the Milsteins thereafter would not place a reasonable person on inquiry notice that Cogan and Holdings would start encumbering assets that they were obligated contractually not to encumber. *See Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *7 (Del.Ch. Jan.24, 2005) (discussing the legal standard for inquiry notice). Furthermore, there is no basis to find that Eureka acted with prejudicial torpor in asserting its claims, once it had notice of Cogan's and Holdings' conduct, or that it acquiesced in those breaches after having full knowledge of the material facts. To the extent that Holdings has thrown up other equitable defenses, they are not discussed because the analysis in this opinion demonstrates their lack of force.

transfer of its fellow member's interest than one in which the fellow member's lender ends up claiming to hold a 50% interest and the ability to veto major transactions. For example, Eureka would now be required to seek O'Shanter's consent before it could 1) cause Niagara Redevelopment to buy or sell any major asset; 2) merge or consolidate the company; 3) institute legal action on behalf of the company; or 4) make a capital call. In addition, § 3.2(d) requires Eureka to "consult with Holdings on the business and affairs of the Company, and meet as reasonably requested to discuss any particular matter requested by Holdings."

The conflict of interest between O'Shanter and Eureka is particularly stark. That Holdings, as directed by O'Shanter, is seeking a payout of $13.2 million or, in the alternative, judicial dissolution of Niagara Redevelopment is not surprising. O'Shanter is a secured creditor of the Cogan Trust, having lent in excess of $800,000 to that Trust, and the Cogan Trust did not make good on those loans. In other words, O'Shanter wants its money—the sooner, the better. Either of Holdings' desired outcomes, a payout to Holdings or a judicial dissolution, would likely provide sufficient funds to cover O'Shanter's loans. But either outcome would leave Eureka, its putative partner, in the lurch by endangering Niagara Development's existing business plan. For example, Eureka has indicated that, under the Development Agreement, dissolution could force Niagara Redevelopment to re-sell certain property to the City at 1997 prices and forfeit $500,000, which is half of the premium it paid to acquire those properties. In addition, in dissolution, Niagara Redevelopment would be at risk of realizing no upside value for the development it has undertaken on those properties, and Eureka has by now invested approximately $32 million of capital into Niagara Redevelopment.

By proposing a remedy built largely on § 18–702(b)(3) of the LLC Act, Eureka has advanced, with some modest alteration, a position that is entirely fitting and non-punitive. Section 18–702(b)(3) states that "[a] member ceases to be a member and to have the power to exercise any rights of powers of a member upon assignment of all of the member's limited liability company interest." [39] By its literal terms, that statute does not apply. But Eureka is correct that the statute addresses an analogous situation and provides a solid foundation for a remedy here. Furthermore, the breaches of the LLC Agreement by Holdings ultimately had the same effect as a "complete assignment for the benefit of creditors," the type of assignment that typically results in the statutory divestiture of a membership interest by virtue of § 18–304 of the LLC Act.[40]

**39.** It is of course true that § 18–702(b)(3) further provides that "[u]nless otherwise provided in a limited liability company agreement, the pledge of, or granting of a security interest, lien, or other encumbrance in or against, any or all of the limited liability company interest of a member shall not cause the member to cease to be a member or to have the power to exercise any rights or powers of a member." In this case, the LLC Agreement explicitly forbade Holdings from encumbering or granting a security interest in its Interest in Niagara Redevelopment in the manner it did. That is, the LLC Agreement explicitly provid-

ed that Holdings would breach the Agreement by granting the encumbrances and security interest it did. Its material breach must be remedied.

**40.** 6 *Del. C.* § 18–304 ("A person ceases to be a member of a limited liability company upon the happening of any of the following events: (1) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, a member: a. Makes an assignment for the benefit of creditors; b. Files a voluntary petition in bankruptcy; [or] c. Is adjudged a bankrupt or insol-

These statutory expressions of policy clearly evince the General Assembly's understanding that it is legitimate for a member of an LLC to craft provisions mandating that its fellow member either retain certain characteristics or lose its membership status. Thus, the statutes reinforce the remedial conclusions clearly suggested by the provisions of the LLC Agreement that were breached: Eureka should not be bound to manage and operate an LLC with a co-member with which it never intended or agreed to go into business. To redress the situation Eureka finds itself in, it is appropriate that Holdings be remitted to holding merely the economic interest of an assignee of a members' interest in Niagara Redevelopment.

The policy that underlies § 18–702(b)(3) is that "it is far more tolerable to have to suffer a new passive co-investor one did not choose than to endure a new co-manager without consent."[41] That is particularly the case where, as here, an LLC is closely held.[42] When an LLC is closely held, "members often work closely with co-owners and, therefore, prefer to select their associates."[43] Transfers of membership interests, then, "introduce potential new conflicts of interest" and "change and perhaps complicate decision-making."[44]

By multiple means, the scriveners of the LLC Agreement for Niagara Redevelopment recognized these dangers and anticipated these conflicts. That is why the LLC Agreement provided Eureka protec-

tions against them. Holdings breached those protections and unless Holdings is deprived of its membership rights, Eureka will be denied its own contractual expectations.

In granting this remedy, I do not work a forfeiture of Holdings' economic interest in Niagara Redevelopment. Instead, consistent with § 18–702(b)(3), Holdings will retain the interest that would have been assignable by it, which "includes only the member's share in profits and losses and the right to participate in distributions."[45] That interest is clarified in § 18–702(b)(2), which provides that an "assignment of a limited liability company interest entitles the assignee to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction, or credit ... to which the assignor was entitled." An assignable limited liability interest, which is what I find Holdings is now entitled to as a result of its unauthorized transfer and breach of the LLC Agreement, is essentially "a financial interest in the member's dividend distributions and any future sale proceeds."[46]

As to the remedy, I must address one last point that the parties ignored in their papers, or at least Holdings did. The LLC Act provides certain rights to assignees, which provide important benefits but do not allow them to participate actively in management.[47] Eureka, then, was careful

vent, or has entered against the member an order for relief, in any bankruptcy or insolvency proceeding...").

41. *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 760 (Del.Ch.2004).

42. Larry E. Ribstein & Robert R. Keatinge, Ribstein and Keatinge on Limited Liability Companies § 7:4 (2005).

43. *Id.*

44. *Id.*

45. *Id.* at § 7.3.

46. *Lusk v. Elliott*, 1999 WL 644739, at *4 (Del.Ch. Aug. 13, 1999).

47. *See* 6 *Del. C.* § 18–1002 ("In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action....").

to minimize the use of the term "assignee" in referring to the rights they argue that Holdings should retain after a divestiture of its membership status. Instead, citing to *Milford Power*, Eureka argues that Holdings should retain "only those economic rights enumerated in § 18–702(b)."[48] In that case, this court held that when a member of an LLC became bankrupt and ceased to be member by virtue of the operation of § 18–304 of the LLC Act, the bankrupt member became an assignee.[49] Although the court cited to § 18–702(b) in referring to what rights the former member would have as an assignee, the court did not explicitly hold that, or even address whether, the assignee would retain the other rights granted assignees by the LLC Act. At least one of those rights, the right to bring a derivative action on behalf of the LLC,[50] is arguably important and does not, in my opinion, subvert the goal of rendering Holdings a passive investor without the ability to stymie good faith managerial action by the remaining member, Eureka, or its designated agents. Because I am crafting a remedy for a breach of the LLC Agreement that should be equitable, I exercise my discretion to declare that Holdings should retain the rights granted an assignee by § 18–1002, which will allow Holdings to sue on behalf of Niagara Development if Eureka breaches a contractual or fiduciary duty owed to that LLC.

In sum, Eureka is the sole member of Niagara Redevelopment. Holdings has ceased to be a member and retains only the status of an assignee with the rights granted to assignees in the LLC Act.

**48.** Eureka's Op. Br. at 19.

**49.** *Milford Power,* 866 A.2d at 762.

**50.** 6 *Del. C.* § 18–1002.

**51.** LLC Agmt. § 9.7(i).

## V. *Holdings' Counterclaims*

My last task is to consider Eureka's request for dismissal of Holdings' counterclaims for either damages related to the breach of the Buy/Sell Provision or dissolution of Niagara Redevelopment. Dismissal of both is appropriate for several reasons.

■ First, Holdings has sought damages for Eureka's failure, after electing to become the Purchasing Member, to purchase Holdings' interest, and that remedy is contractually inappropriate. The LLC Agreement is clear as to what remedy is available to a member who invokes the Buy/Sell Provision but who is met with a response by the other member that it wishes to be the Purchasing Member and then refuses to purchase: the non-defaulting Selling Member may buy the Purchasing Member's stake at the original buyout price minus 10%.[51] If the Purchasing Member refuses to go to closing at that price, the aggrieved Selling Member who has the right to buy at a bargain is then free to go to court to seek specific performance of its right to buy. But the Selling Member may not, as Holdings seeks to do, claim damages for the Purchasing Members' refusal to buy. If the aggrieved Selling Member elects, as Holdings has done, not to seek specific performance in the required timely manner, then the only consequences to the Purchasing Member in default is provided by the LLC Agreement: the defaulting Purchasing Member loses the right to ever invoke the Buy/Sell Provision in the future.[52]

**52.** LLC Agmt. § 9.7(i)(i) (editor's note—yes, as strange as this looks, it is the correct citation).

Second, if Holdings decided now to seek specific performance, its request would fail for three reasons. The initial one is that a request for specific performance must be made with alacrity or be lost.[53] Holdings has sat on its hands without seeking this relief, and it may not subject Eureka to the risks of continued ownership while reserving to itself the right to buy out Eureka at a price Holdings itself set nearly four years ago.

As important, the record is clear that Holdings had materially breached the LLC Agreement when Cogan granted a security interest in Holdings to O'Shanter before Holdings invoked the Buy/Sell Provision.[54] Therefore, Holdings is in no equitable position to claim that it was entitled to invoke the Buy/Sell Provision when it did so after it had clandestinely provided a creditor of the Cogan Trust with rights in Holdings in violation of the LLC Agreement. Put another way, once Cogan caused the Cogan Trust to grant O'Shanter the illicit security interest in Holdings, Holdings effectively deprived itself of any right to act as a member of Niagara Redevelopment.

Lastly, as to the claim predicated on the Buy/Sell Provision, it is undisputed that Holdings lacked the financial capacity to actually purchase Eureka's interest for the $26 million price Holdings set in the November 7, 2002 offer. Moreover, even as to the later period when Holdings had the right to buy at a 10% discount to that price, Holdings lacked the wherewithal to close on the terms it set in its original offer.

█ As a final matter, Holdings' claim for dissolution also must be dismissed. Holdings' only plausible argument for dissolution is that Eureka and O'Shanter do not get along and that the procession of Niagara Redevelopment is therefore impracticable. Because Holdings will now have only the rights of an assignee, Eureka will have the authority to act as the sole member and without Holdings' ability to veto major transactions. Therefore, no impasse exists.[55]

Additionally, given the conduct of Cogan in turning over effective control of Holdings to his creditors without consent, there is no inequity in making O'Shanter and other Cogan creditors remain as passive interest holders. O'Shanter was aware of the LLC Agreement and is not in a sympathetic position to demand that Eureka treat it as a fellow member when O'Shanter obtained its position without Eureka's consent. If O'Shanter desires repayment of its principal loan of nearly $800,000 plus interest earlier, it will have to bargain with

---

**53.** *E.g., Certainteed,* 2005 WL 217032, at *13.

**54.** Holdings' material breach of the LLC Agreement rendered it unable to complain of a later breach by Eureka. *See DeMarie v. Neff,* 2005 WL 89403, at *4 (Del.Ch. Jan.12, 2005) ("[A] material breach excuses performance of a contract."); *All Pro Maids, Inc. v. Layton,* 2004 WL 1878784, at *6 n. 35 (Del. Ch. Aug.9, 2004) (discussing whether a prior material breach was committed, which would preclude further enforcement of a contract).

**55.** Holdings argues, based upon § 10.1(a)(1) of the LLC Agreement, that dissolution is appropriate if Eureka succeeds in its efforts to terminate Holdings' membership interest in Niagara Redevelopment. That section states that "[t]he Company shall be dissolved and its affairs shall be wound up upon the first to occur of the following: (1) ... the occurrence of any other event that terminates the continued membership of a Member in the Company...." Holdings conveniently ignores what follows, which is that dissolution shall occur "unless the business of the Company is continued by the consent of a Majority–in–Interest of the remaining Members within ninety (90) days following the occurrence of any such event." Clearly, Eureka, which will be the sole remaining member, intends to continue Niagara Redevelopment's business.

Eureka to achieve that end consensually or await Niagara Redevelopment's entry into transactions that provide its owners with dividends or cash in exchange for a sale of the business.

## VI.  *Conclusion*

For the foregoing reasons, Eureka's summary judgment motion seeking a declaration that it is the sole member of Niagara Redevelopment is hereby GRANTED. In addition, Eureka's motion to dismiss Holdings' counterclaim for breach of the LLC Agreement is GRANTED and its motion to dismiss Holdings' counterclaim for dissolution is GRANTED. Eureka shall submit a conforming final judgment within two weeks, after notice to Holdings as to form.