# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE OXBOW CARBON LLC | ) | C.A. No. 12447-VCL |
| UNITHOLDER LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: June 14, 2018
Date Decided: August 1, 2018

Kenneth J. Nachbar, Thomas W. Briggs, Jr., Richard Li, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; R. Robert Popeo, Michael S. Gardener, Breton Leone-Quick, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C., Boston, Massachusetts; *Attorneys for Oxbow Carbon LLC*.

Stephen C. Norman, Jaclyn C. Levy, Daniyal M. Iqbal, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; David B. Hennes, C. Thomas Brown, Adam M. Harris, Elizabeth D. Johnston, ROPES & GRAY LLP, New York, New York; *Attorneys for Oxbow Carbon & Minerals Holdings, Inc., Ingraham Investments LLC, Oxbow Carbon Investment Company LLC, and William I. Koch.*

Kevin G. Abrams, Michael A. Barlow, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Brock E. Czeschin, Matthew D. Perri, Sarah A. Galetta, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael B. Carlinsky, Chad Johnson, Jennifer Barrett, Silpa Maruri, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Crestview-Oxbow Acquisition, LLC, Crestview-Oxbow (ERISA) Acquisition, LLC, Crestview Partners, L.P., Crestview Partners GP, L.P., Crestview Advisors, L.L.C., Robert J. Hurst, and Barry S. Volpert.*

J. Clayton Athey, John G. Day, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Dale C. Christensen, Jr., Michael B. Weitman, SEWARD & KISSEL LLP, New York, New York; *Attorneys for Load Line Capital LLC.*

**LASTER, V.C.**

In a lengthy post-trial ruling,[1] I held that the Koch Parties breached the Reasonable Efforts Clause in Oxbow's LLC Agreement by seeking to disrupt, derail, and delay an Exit Sale.[2] I found that "[b]ut for Koch's actions, Oxbow would have entered into a deal with ArcLight, and the Minority Members would have received at least the value of the ArcLight Offer."[3] I further determined that if an Exit Sale did not satisfy the 1.5x Clause for the Small Holders, then the Minority Members could force Oxbow, Oxbow Holdings, and Oxbow's other members to engage in an Exit Sale by providing additional consideration to the Small Holders through a Seller Top Off.

The parties' post-trial briefing focused predominantly on breach and only minimally on remedy. The Post-Trial Ruling therefore directed the parties to provide supplemental briefing on an appropriate remedy. They complied, and a hearing was held.

This decision awards a multi-part remedy. The first component is a decree of specific performance. Pursuant to that decree, the parties shall complete the Exit Sale process that the Minority Members initiated. Because the resulting undertaking will be complex, and because the parties have demonstrated their ability to disagree on matters

---

[1] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760 (Del. Ch. Feb. 12, 2018) (the "Post-Trial Ruling").

[2] That sentence, this paragraph, and the balance of this decision use a slew of defined terms drawn from the Post-Trial Ruling. This decision employs those terms in accordance with the meanings provided in the Post-Trial Ruling.

[3] *Post-Trial Ruling*, 2018 WL 818760, at *69.

1

large and small, a court-appointed monitor will oversee the parties' compliance with the Exit Sale Right.

The second component is a potential award of compensatory damages related to the Exit Sale transaction price. During the events giving rise to this litigation, the Minority Members secured an actionable Exit Sale in the form of the ArcLight Offer. The record establishes that a transaction with ArcLight could have closed by September 30, 2016. But for the Koch Parties' breach, the Minority Members would have secured the value of the ArcLight Offer at that time. An award of specific performance that merely orders the Koch Parties to perform under the LLC Agreement would not address the loss of the ArcLight Offer. It would result in a do-over for the Koch Parties. Throughout the Exit Sale process, the Koch Parties sought to delay any Exit Sale. An award of specific performance framed as a do-over would give them what they sought.

In my view, a complete remedy for the Koch Parties' breach must take into account the lost value of the ArcLight Offer, including the lost time value of not receiving the consideration by September 30, 2016. It is possible that a resumed Exit Sale process may produce a transaction generating greater value for the Minority Members, even on a time-adjusted basis. If so, then no additional compensatory remedy is warranted for lost transaction value. But if not, then the Minority Members will receive an award of compensatory damages equal to the difference between the value of the Exit Sale that the process generates and the time-adjusted value of the ArcLight Offer.

The third component is an award of damages equal to the Minority Members' *pro rata* share of (i) the expenses that Koch caused Oxbow to incur for Mintz Levin and (ii)

2

any duplicative amounts that Oxbow must spend on its advisors for the resumed Exit Sale process. Koch originally hired Mintz Levin as his personal counsel, and he used the firm to resist the Minority Members' efforts to generate an Exit Sale. Soon after hiring Mintz Levin, Koch realigned the firm as Oxbow's counsel. In this role, Mintz Levin continued to serve Koch's interests, but Oxbow bore the expense. As result, the Minority Members indirectly bore one-third of the estimated $50 million that Oxbow paid to Mintz Levin. Mintz Levin's efforts on Koch's behalf were an integral part of the breach of the Reasonable Efforts Clause. An Exit Sale will not enable the Minority Members to recoup their share of the amounts paid to Mintz Levin, because a buyer will pay for Oxbow as it is, without giving any credit for sunk costs. Although a suit to recover Mintz Levin's fees typically would be asserted derivatively, the dispute over Oxbow functionally has two sides, and the allocation of proceeds and expenses between the two sides is a zero-sum game. Because of the connection between the payments to Mintz Levin and the breach of the Reasonable Efforts Clause, the Minority Members can recover their share of those amounts as damages in this proceeding.

A similar analysis applies to amounts that Oxbow paid to its advisors—Goldman and Cravath—that were wasted due to the Koch Parties' breach of the Reasonable Efforts Clause. Some of the work that these advisors performed will have value in the resumed Exit Sale process, but some of its benefits will be lost, and the advisors will have to perform the same tasks again. The losses from having to pay for work twice flow directly from the Koch Parties' breach and will not be recaptured in an Exit Sale. For the Minority Members to be made whole, a remedial award must include their *pro rata* share of those amounts.

3

Finally, the Minority Members will receive pre- and post-judgment interest on any award of compensatory damages. They will also receive an award of costs as the prevailing parties.

## I.   LEGAL ANALYSIS

The Court of Chancery "has broad latitude to exercise its equitable powers to craft a remedy."[4] The court's remedial powers "are complete to fashion any form of equitable and monetary relief as may be appropriate" and "to grant such other relief as the facts of a particular case may dictate."[5] The court is not limited to choosing among the specific proposals advanced by the parties; instead, "this Court frequently has relied on its own remedial discretion to fashion a different remedy than what the parties may have requested

---

[4] *Hogg v. Walker*, 622 A.2d 648, 654 (Del. 1993); *accord Berger v. Pubco Corp.*, 976 A.2d 132, 139 (Del. 2009) ("[T]he Court of Chancery has broad discretion to craft an appropriate remedy . . . , the propriety of a court-ordered remedy is ordinarily reviewed for abuse of discretion."); *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 525 (Del. 2008) ("The Court of Chancery has broad discretion to fashion equitable relief.").

[5] *Weinberger v. UOP, Inc.*, 457 A.2d 701,714 (Del. 1983); *accord Whittington v. Dragon Gp. L.L.C.*, 2011 WL 1457455, at *15 (Del. Ch. Apr. 15, 2011) ("This Court, as a court of equity, has broad discretion to form an appropriate remedy for a particular wrong."); *Cantor Fitzgerald, L.P. v. Cantor*, 2011 WL 536911, at *3 (Del. Ch. May 11, 2001) ("[T]his 'Court, fortunately, has broad discretion to tailor remedies to suit the situation as it exists.'" (quoting *Andresen v. Bucalo*, 1984 WL 8205, at *4 (Del. Ch. Mar. 14, 1984))); *McGovern v. Gen. Hldg., Inc.*, 2006 WL 1468850, at *24 (Del. Ch. May 18, 2006) (Strine, V.C.) ("The Supreme Court has emphasized the capacious remedial discretion of this court to address inequity."). *See generally Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

4

when the circumstances so require."[6] Put more poetically, the "protean power of equity" allows a court to "fashion appropriate relief," and a court "will, in shaping appropriate relief, not be limited by the relief requested by the plaintiff."[7] Consequently, "once a right to relief in Chancery has been determined to exist . . . [the court can] shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action."[8] For a proven breach of contract, the Court of Chancery has "the discretion to award any form of legal and/or equitable relief and is not limited to awarding contract damages for breach of the agreement."[9]

The power to grant factually tailored remedies designed to provide complete redress represents "the fundamental purpose of an equity court"[10] and "closely comports with the

---

[6] *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011).

[7] *Tex. Instruments Inc. v. Tandy Corp.*, 1992 WL 103772, at *6 (Del. Ch. May 12, 1992) (Allen, C.).

[8] *Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964).

[9] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 176 (Del. 2002); *see also, e.g.*, *Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 113-115 (Del. Ch. 2006) (Strine, V.C.) (crafting equitable remedy for breach of LLC agreement); *Haley v. Talcott*, 864 A.2d 86, 98 (Del. Ch. 2004) (Strine, V.C.) (holding that contractual exit remedy in LLC agreement was not reasonable and awarding sale as equitable remedy).

[10] William T. Quillen & Michael Hanrahan, *A Short History of the Delaware Court of Chancery—1792-1992*, 18 Del. J. Corp. L. 819, 820 (1993) (describing the need "to provide relief suited to the circumstances when no adequate remedy is available at law" as the "fundamental purpose of an equity court"); *see also Schoon v. Smith*, 953 A.2d 196, 204-05 (Del. 2008) ("[T]he Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give

historical foundations of Chancery jurisdiction."[11] The Court of Chancery of the State of Delaware traces its jurisdictional lineage to the High Court of Chancery of Great Britain at the time of the separation of the colonies.[12] In the mother country, before the advent of equity, the English courts used forms of action, also known as common law writs, under which the available remedial rights were strictly tied to individual forms. If a case did not fit within the form, then "the injured party was without any ordinary legal remedy, and his only mode of redress was by an application made directly to the King."[13] As the font of authority in a monarchial system, the king could deploy the coercive power of the state to provide relief in a given case. In practice, the king "referred such petitions to his chancellor for action."[14]

---

any relief." (quoting 1 John Norton Pomeroy, *Equity Jurisprudence* § 60, at 78 (5th ed. 1941))

[11] *Taylor v. Jones*, 2006 WL 1510437, at *5 (Del. Ch. May 25, 2006).

[12] *DuPont v. DuPont*, 85 A.2d 724, 727 (Del. 1951) ("[T]he general equity jurisdiction of the Court of Chancery . . . is defined as all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies, subject to the proviso . . . to the effect that the Chancellor shall not hear and determine any cause where a sufficient remedy exists at law.").

[13] 1 Pomeroy, *supra*, § 21, at 28.

[14] 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 2.2, at 69 (2d ed. 1993); *see also* Henry L. McClintock, *Handbook of the Principles of Equity* § 2, at 3 (2d ed. 1948) ("The power of the chancellor as an equity judge and his jurisdiction to give relief in those cases where the ordinary forms of the common law were not adequate to meet the case were both derived from the prerogative of the king to administer justice between his subjects unfettered by the restrictions of ordinary procedure.").

Through the chancellor's exercise of his discretion to solve the challenges of particular cases, the system of equity developed.[15] "Having arisen largely to compensate for the common law's inability to provide full, fair, and just relief in all instances, equity has evolved as a broad and flexible concept, designed to employ judicial principles and tools creatively so as to effect justice in any given circumstance."[16]

> Equitable remedies . . . are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and reshaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.[17]

"It cannot be said too forcefully that the general powers of the Court of Chancery refers to that complete system of equity as administered by the High Court of Chancery of Great Britain . . . ."[18] "[T]hree successive [Delaware] Constitutions—1792, 1832 and 1897— intended 'to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity' and the Constitutional provision establishing the Court

---

[15] *See* 1 Dobbs, *supra*, § 2.2, at 66-74; 1 Joseph Story, *Commentaries on Equity Jurisprudence* ¶ 43, at 39-40 (13th ed. 2000).

[16] Donald J. Wolfe, Jr. & Michael A. Pittinger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.01[a], at 12-2 (2017); *see also Taylor*, 2006 WL 1510437, at *5 (citing this court's "historical readiness to adapt to the circumstances of each case and craft appropriate remedies, in contrast to the perhaps more rigid application of law in jurisdictions without similar traditions" (footnote omitted)).

[17] Pomeroy, *supra*, § 109, at 141; *accord PharmAthene*, 2011 WL 6392906, at *3 n.30.

[18] *Glanding v. Indus. Tr. Co.*, 45 A.2d 553, 558 (Del. 1945).

7

of Chancery was a 'guarantee to the people of the State that equitable remedies will at all times be available for their protection.'"[19]

## A.     Specific Performance

The primary component of the remedy warranted by the facts of this case is a decree of specific performance. That decree will direct the parties to resume and complete the Exit Sale process.

"A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties."[20] Its purpose "is to place the aggrieved party in the position that it would have been in but for the breach."[21] "[S]pecific performance is a matter of grace that rests in the sound discretion of the court."[22] Its proponent "must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy. A party seeking specific performance must establish that (1) a valid contact exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance."[23]

---

[19] Quillen & Hanrahan, *supra*, at 849 (quoting *DuPont*, 85 A.2d at 729).

[20] *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005) (Strine, V.C.).

[21] *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1998 WL 71836, at *9 (Del. Ch. Feb. 4, 1998).

[22] *Peden v. Gray*, 2005 WL 2622746, at *3 (Del. Oct. 14, 2005) (TABLE).

[23] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (footnotes omitted).

The first two requirements are easily met. The Exit Sale Right is a valid and specifically enforceable provision in the LLC Agreement, which is a valid and specifically enforceable contract, and the Minority Members are ready, willing, and able to perform under its terms.

The third requirement—that the balance of the equities favors an order of specific performance—is also met. This requirement "reflect[s] the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering."[24] When balancing the equities, the court "must be convinced that specific enforcement of a validly formed contract would [not] cause even greater harm than it would prevent."[25]

The Minority Members bargained for the right to exit their investment after seven years, without a minority discount.[26] By breaching the Reasonable Efforts Clause, the Koch Parties deprived them of this right.[27] Absent an Exit Sale, deriving a legal remedy measured in dollars will be difficult. As the Post-Trial Ruling observed, an award of compensatory

---

[24] *Morabito v. Harris*, 2002 WL 550117, at *2 (Del. Ch. Mar. 26, 2002) (internal quotation marks omitted) (quoting *Bernard Pers. Consultants, Inc. v. Mazarella*, 1990 WL 124969, at *3 (Del. Ch. Aug. 28, 1990) (Allen, C.)).

[25] *Osborn*, 991 A.2d at 1161 (alteration in original) (internal quotation marks omitted) (quoting *Szambelak v. Tsipouras*, 2007 WL 4179315, at *7 (Del. Ch. Nov. 19, 2007)).

[26] *Post-Trial Ruling*, 2018 WL 818760, at *66-67.

[27] *See CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *9 (Del. Ch. Oct. 1, 2012) (finding balance of equities favored specific performance in part because "equity respects the freedom to contract and teaches that parties should receive the benefit of their bargain through specific performance").

9

damages could be keyed off the value of the ArcLight Offer, but also would have to take into account that the Minority Members retain their units. To calculate damages, the court would have to ascribe a value to those units and award the delta between that and what the Minority Members would have received if an Exit Sale had closed on the terms implied by the ArcLight Offer.

Because Oxbow is a private company, determining a point value for the Minority Members' units could be difficult. In this case, the determination would need to reflect the fact that without an Exit Sale, the Minority Members will be trapped in an minority investment with a hostile controller who has demonstrated his antagonism to and disregard for their interests. The award also would need to incorporate some offset for the imperfect substitute of a possible future sale of their minority position.[28] The parties could try to fill in these blanks with expert testimony, but the answers would uncertain and constrained by the inherent limits of human knowledge and insight.[29]

A decree of specific performance that results in an Exit Sale addresses directly the harm that the Minority Members otherwise would suffer from losing their right to exit by

---

[28] *See Post-Trial Ruling*, 2018 WL 818760, at \*67 (noting that the ability of the Minority Members to transfer their units under Section 6 of the LLC Agreement "is not a viable substitute for an Exit Sale" because "it contemplates a minority investor transaction that would carry a minority discount" and that the buyer "would pay less for other reasons" as well).

[29] *See Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 24 (Del. 2017) (casting doubt on the reliability of "an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."); *id.* at 35 (cautioning against "the hazards that always come when a law-trained judge is forced to make a point estimate of fair value based on widely divergent partisan expert testimony").

that means. It also provides a market-tested input for any additional calculation of transaction-related compensatory damages. And it has the benefit of enabling two warring factions to go their separate ways. Under the circumstances, a decree of specific performance is "decisively preferable to a vague and imprecise damages remedy that cannot adequately remedy the injury."[30]

The Koch Parties contend that a decree of specific performance can only order a party to comply with a specific contractual provision as written, without any discretion for the court to tailor the decree to the facts of the case. Building on this premise, they argue that the decree must enforce the Exit Sale Right as a whole, meaning that the parties must start from the beginning, as if the Minority Members were exercising the Exit Sale Right for the first time. Consequently, as the Koch Parties see it, any Exit Sale must satisfy "all the conditions for such a sale, including that such bid equals or exceeds the current fair market value of Oxbow, which should be re-determined to reflect current market conditions."[31]

---

[30] *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 84 (Del. Ch. 2001) (Stine, V.C.); *see Corkscrew Mining Ventures, Ltd. v. Preferred Real Estate Invs., Inc.*, 2011 WL 704470, at *7 (Del. Ch. Feb. 28, 2011) (holding that "the balance of the equities favors specific performance because the Securities represent a minority interest in a privately held limited liability company, and the restriction on their transfer precludes Corkscrew from selling the Securities in any other market"); *see also Collins v. Am. Int'l Gp., Inc.*, 1998 WL 227889, at *6 (Del. Ch.) (holding that specific performance was appropriate "where the assessment of money damages is impracticable"), *aff'd*, 719 A.2d 947 (Del. 1998); McClintock, *supra*, § 60, at 149 (noting the availability of specific performance where "the damages cannot be adequately ascertained").

[31] Answering Br. Regarding Remedy at 1.

11

Forcing the parties to go back to the beginning would involve a multitude of steps before any sale process could begin.

- First, the Minority Members would secure an opinion as to the Fair Market Value of their units and submit a demand to have Oxbow purchase their units at that price.

- Second, Oxbow would determine whether to accept that valuation or not. If it declined, Oxbow would retain an investment bank of its own and have that bank generate an opinion as to Fair Market Value.

- Third, if the two valuations were within 10% of each other, then Fair Market Value would be the average of the two. If the two valuations differed by more than 10%, then the two banks would select a third bank.

- Fourth, if necessary the new bank would prepare a valuation, and Fair Market Value would be the median of the three valuations.

- Fifth, once Fair Market Value had been determined, Oxbow would decide whether to purchase the Minority Members' units at that price.

- Sixth, if Oxbow did not purchase the Minority Members' units for Fair Market Value, then that figure would become the hurdle for the FMV Clause.

- Seventh, after Oxbow had failed to purchase the Minority Members' units, then the Minority Members could cause Oxbow to begin pursuing an Exit Sale.[32]

The first time around, accomplishing these steps took approximately five months and provided fertile ground for machinations and disputes.

Consistent with their desire for a restart, Koch Parties also believe that Oxbow must select an entirely new financial advisor and entirely new counsel. The Koch Parties believe that Oxbow should not use Goldman or Cravath because after the positions those firms took during the interrupted sale process and this litigation, working with them would be difficult.

---

[32] *See generally Post-Trial Ruling*, 2018 WL 818760, at *31-33.

12

Conceptually, the Koch Parties' position imbues the remedial decree of specific performance with the brittle stiffness of the old, common law writs. By arguing that an equitable decree can only enforce the entirety of a contractual provision as written, without any tailoring to the facts of the case, they adopt a view fundamentally inconsistent with the essence of equitable remedies: "their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use."[33] To restate, equity is "a broad and flexible concept, designed to employ judicial principles and tools creatively so as to effect justice in any given circumstance."[34]

On the facts, the Koch Parties' approach to specific performance would turn lemons (having been found to have breached the Reasonable Efforts Clause) into lemonade (a complete do-over). The Koch Parties breached the Reasonable Efforts Clause because they wanted to "obstruct [and] derail" or "delay" the Exit Sale process.[35] The decree they propose would reward them for their breach by wiping the slate clean and telling everyone to start over, thereby giving the Koch Parties the benefit of a multiyear delay.

The decree of specific performance that this decision adopts is a remedial decree intended to address the Koch Parties' breach of the Reasonable Efforts Clause. It seeks to put the Minority Members in at least the same position as they would have been in if the

---

[33] Pomeroy, *supra*, § 109, at 141; *accord PharmAthene*, 2011 WL 6392906, at *3 n.30.

[34] Wolfe & Pittenger, *supra*, § 12.01[a], at 12-2.

[35] JX 2068 at DEF-EPJ_00021726.

13

Koch Parties had not breached and the parties had completed an Exit Sale in accordance with the terms of the ArcLight Offer. The decree therefore calls for the resumption and continuation of the Exit Sale process at the decisive point of breach: the Koch Parties' successful frustration of the otherwise actionable ArcLight Offer after Oxbow received it on May 27, 2016. The decree does not wipe the slate clean and call for a complete do-over. It instructs the parties to resume the Exit Sale process as the state of play existed at that point.[36]

One consequence of this ruling is that Oxbow shall continue to use Goldman and Cravath as its advisors in connection with the Exit Sale process. This aspect of the ruling confers the additional benefits of enabling Oxbow to benefit from the expertise and knowledge that Goldman and Cravath developed, avoiding the additional cost required to bring new advisors up to speed, and sidestepping potential complications that could arise from Goldman's contingent compensation arrangement if a new banker came onboard and completed the assignment.

---

[36] Because this decision refers to the frustration of the ArcLight Offer as the "decisive point of breach," the Koch Parties may construe it as exonerating their prior conduct. That is not the intent. This decision seeks to craft a remedy for the Koch Parties' breach as adjudicated in the Post-Trial Ruling. In making a finding of breach, the Post-Trial Ruling cited conduct by the Koch Parties that pre-dated the receipt of the ArcLight Offer. *See Post-Trial Ruling*, 2018 WL 818760, at *67-69. It remains the case that the Koch Parties' conduct throughout the Exit Sale process contributed to the finding of breach, but ArcLight nevertheless came forward with the ArcLight Offer. Because the ArcLight Offer was actionable, it provides a real-world basis for constructing a remedy. The point in time at which the ArcLight Offer emerged therefore also becomes the logical starting point for crafting the remedy. Doing so does not excuse the Koch Parties' earlier conduct.

Another consequence of this ruling is that the terms for compliance with the FMV Clause shall remain at the value that was established at the time of breach. To satisfy the FMV Clause, the Exit Sale must result in consideration of at least $2.65 billion, equating to at least $169 per unit.[37] Consistent with the Post-Trial Ruling's determination regarding the implied covenant, if the process generates an Exit Sale that clears the FMV Clause, then the Minority Members can satisfy the 1.5x Clause through a Seller Top Off.

The Koch Parties have argued that the FMV Clause figure is stale and must be updated, but that would give them the do-over that they do not deserve. Moreover, the Koch Parties only have the opportunity to argue now that the FMV Clause hurdle is stale because they breached the Reasonable Efforts Clause two years ago and prevented a transaction based on the ArcLight Offer from closing. To the extent that the FMV Clause hurdle is stale, the Koch Parties brought that situation on themselves. To update the FMV Clause hurdle now would enable the Koch Parties to benefit from their breach and penalize the Minority Members.

The parties shall begin preparing Oxbow for an Exit Sale as soon as reasonably possible. The Exit Sale should be completed no more than one year from final judgment (including the completion of any appeals), subject to reasonable requests to extend the process for good cause shown.

---

[37] *See Post-Trial Ruling*, 2018 WL 818760, at \*34.

15

## B. The Appointment Of A Monitor

An additional component of the primary remedy warranted by the facts of this case is the appointment of a monitor to supervise the parties' compliance with the decree of specific performance. The Post-Trial Ruling suggested that it might be appropriate to appoint a receiver with the authority to carry out the Exit Sale process. The Minority Members embraced this proposal; the Koch Parties resisted it. At this stage in the proceedings, I believe a monitor is a better solution.

When determining whether to award specific performance, a court of equity must take into account the complexity of the task that the parties will be directed to undertake.[38] Chancellor Allen once dismissed a claim seeking specific performance of an obligation to use best efforts to obtain regulatory approval for a merger, observing that

> the remedy of specific enforcement of a contractual obligation to proceed in good faith, while available in appropriate instances, is unavailable where the contract sued upon relates to a future, evolving complex commercial transaction and any attempt to specifically enforce a right to good faith best efforts would necessarily involve either an order of such vague generality as

---

[38] *Restatement (Second) of Contracts* § 366 (Am. Law Inst. 1981), Westlaw (database updated June 2018) ("A promise will not be specifically enforced if the character and magnitude of the performance would impose on the court burdens in enforcement or supervision that are disproportionate to the advantages to be gained from enforcement and to the harm to be suffered from its denial."); *accord* 71 Am. Jur. 2d *Specific Performance* § 111, Westlaw (database updated May 2018); 3 Dobbs, *supra*, § 12.8(3), at 207; *see* 25 Richard A. Lord, *Williston on Contracts* § 67:22 (4th ed.), Westlaw (database updated May 2018) (comparing historical rule that equity lacked jurisdiction to issue a decree of specific performance when the factual situation was too complex with modern approach); *see also N. Del. Indus. Dev. Corp. v. E.W. Bliss Co.*, 245 A.2d 431, 433 (Del. Ch. July 9, 1968) ("It is not that a court of equity is without jurisdiction in a proper case to order the completion of an expressly designed and largely completed construction project, particularly where the undertaking to construct is tied in with a contract for the sale of land and the construction in question is largely finished.").

16

to give little or no specific direction to the person or entity subject to the order or would involve the court in the detailed administration of an ongoing, complex transaction.[39]

In other circumstances, this court has held that the facts warranted a decree of specific performance that directed the parties to complete an acquisition.[40]

Courts of equity have tools at their disposal to mitigate the problem of supervising a complex remedy. One proven tool is to appoint an agent of the court to provide assistance. In his treatise on equity jurisprudence, Professor Pomeroy discusses the power of a court to appoint a receiver "after judgment" in order "to carry into effect a special decree, which could not otherwise be efficiently executed by ordinary process."[41] In a treatise focusing on receivers, Professor Clark recognizes that a receiver can be appointed "after judgment . . . either for the purpose of carrying the judgment into effect, or for the preservation of the property until judgment shall be executed."[42] In his treatise on remedies, Professor Dobbs

---

[39] *Carteret Bancorp, Inc. v. Home Gp., Inc.*, 1988 WL 3010, at *1 (Del. Ch. Jan. 13, 1988) (Allen, C.); *see also Wholesale Janitor Supply Co., Inc. v. Diamond Motor Sports, Inc.*, 1979 WL 6167, at *1 (Del. Ch. Mar. 1, 1979) ("[I]t would appear that plaintiff does not have the absolute right to seek specific performance of the lease here in issue because such form of relief would, in effect, constitute specific performance of a building contract which a court of equity should not generally have to supervise.").

[40] *See IBP*, 789 A.2d at 82-83.

[41] 4 Pomeroy, *supra*, § 1335, at 931.

[42] 1 Ralph Ewing Clark, *The Law and Practice of Receivers* § 240, at 349 (3d ed. 1959).

17

observes that "a master might be appointed to monitor the execution of and compliance with a complex decree and report to the court if the defendant fails to comply."[43]

Federal courts have long exercised this authority. In 1920, the United States Supreme Court held that "[c]ourts have . . . inherent power to provide themselves with appropriate instruments required for the performance of their duties."[44] That inherent power was subsequently codified in Federal Rule of Civil Procedure 53, which governs the appointment of masters.[45] The rule empowers the courts to appoint a master to "address . .

---

[43] 1 Dobbs, *supra*, § 1.4, at 20; *see also* 3 Dobbs, *supra*, § 12.8(3), at 209 ("[I]f supervision really is required, it may sometimes be delegated to a master, receiver, or arbitrator, whose charges would be paid for by the parties."); Wayne D. Brazil, *Special Masters in Complex Cases: Extending the Judiciary or Reshaping Adjudication?*, 53 U. Chi. L. Rev. 394, 414 (1987) ("Masters have long been used to monitor compliance with injunctions or to administer funds."); Ellen E. Deason, *Managing the Managerial Expert*, 1998 U. Ill. L. Rev. 341, 352 (1998) ("After a finding of liability, masters are often appointed at the remedial stage of complex cases to aid in formulating the decree, assist the court in implementing it, and monitor compliance. In fact, these new roles are reportedly now more commonplace than traditional references to masters." (footnote omitted)); Veronica Root, *Modern-Day Monitorships*, 33 Yale J. on Reg. 109, 116-17 (2016) ("One type of posttrial matter with which court-appointed agents assisted courts was to ensure that parties complied with a court's order of specific performance.").

[44] *In re Peterson*, 253 U.S. 300, 312 (1920); *see also id.* at 309-10 ("New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice."). *See generally* Wayne D. Brazil, *Referring Discovery Tasks to Special Masters: Is Rule 53 a Source of Authority and Restrictions?*, 1983 Am. B. Found. Res. J. 143, 176 (1983).

[45] *See* Irving R. Kaufman, *Masters in the Federal Courts: Rule 53*, 58 Colum. L. Rev. 452, 462 (1958) ("[R]ule 53 was intended merely as a codification of pre-existing procedures, and it may be assumed that references sanctioned by long usage and practice in the federal courts were not intended to be forever foreclosed by the rule."); Elizabeth Montgomery, Comment, *Force and Will: An Exploration of the Use of Special Maters to Implement Judicial Decrees*, 52 U. Colo. L. Rev. 105, 111 (1980) ("[Rule 53] embodies the case law that was established by the Supreme Court in *Ex Parte Peterson*.").

. post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."[46] The federal courts have construed the rule to supplement, rather than displace, their inherent authority to appoint officers to aid in the enforcement of judgments.[47]

The federal courts have deployed this authority broadly in what scholars have called institutional reform litigation.[48] In these cases, the courts "sought to reform constitutional

---

[46] Fed. R. Civ. P. 53(a)(1)(C); *see also* 9C Arthur R. Miller, *Federal Practice & Procedure* § 2602.1 (3d ed.), Westlaw (database updated April 2018) (discussing reliance on the rule "when a complex decree requires administration or complex policing, particularly when a party has proved resistant or intransigent or special skills are needed").

[47] *See, e.g.*, *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir.) ("[R]ule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy."), *amended and vacated in other part*, 688 F.2d 266 (5th Cir. 1982); *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956) ("Beyond the provisions of Rule 53 . . . for appointing and making references to Masters, a Federal District Court has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.'" (quoting *Peterson*, 253 U.S. at 312)); *Hellebust v. Brownback*, 824 F. Supp. 1524, 1528 (D. Kan. 1993) ("Although this court appoints a receiver under its inherent equitable powers, it is guided by the provisions of Rule 53 . . . ."); *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 551 F. Supp. 1165, 1178-79 (E.D.N.Y. 1982) (noting that "[t]he court has always had the equity power to fashion the relief necessary to protect its judgment against future violations" and that it "need not rely solely on Rule 53 for its equity power to provide itself with the appropriate instrument to enforce its decree."), *rev'd in part, aff'd in relevant part*, 706 F.2d 956 (2d Cir. 1983).

[48] *See generally* Curtis J. Berger, *Away from the Court House and Into the Field: The Odyssey of a Special Master*, 78 Colum. L. Rev. 707 (1978); Robert E. Buckholz, Jr. et al., *The Remedial Process in Institutional Reform Litigation*, 78 Colum. L. Rev. 784 (1978); Vincent M. Nathan, *The Use of Masters in Institutional Reform Litigation*, 10 U. Tol. L. Rev. 419 (1979); Note, *Implementation Problems in Institutional Reform Litigation*, 91 Harv. L. Rev. 428 (1977). Much of the authority dates from the latter part of the twentieth century. For more recent examples, see *United States v. City of New York*, 2011 WL 4639832, at *16 (E.D.N.Y. Oct. 5, 2011) (issuing Draft Remedial Order to desegregate New York City Fire Department including appointing monitor to "take primary

and statutory defects in the structures and practices of various social institutions,"[49] such as schools,[50] prisons,[51] and mental health institutions.[52] Confronted with difficult and

---

responsibility for leading the parties through the specific remedial steps" and giving the monitor "the duty and the authority to proactively audit and investigate the City's compliance with the terms"); *John B. v. Menke*, 176 F. Supp. 2d 786, 807-08 (M.D. Tenn. 2001) (noting that "[t]he use of a special master to ensure compliance with a court's remedial order is well-established" and appointing "under its inherent equitable authority" a "special master to facilitate the implementation of an [Early Periodic Screening, Diagnosis and Treatment]-compliant State Medicaid plan").

[49] Buckholz et al., *supra*, at 788.

[50] *See, e.g.*, *Reed v. Rhodes*, 635 F.2d 556, 558 (6th Cir. 1980) (affirming appointment of "desegregation administrator" as remedy for civil contempt of desegregation injunction against school); *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976) (affirming appointment of receiver to compel desegregation of school, noting that "[r]emedial devices should be effective and relief prompt," "receiverships are and have for years been a familiar equitable mechanism," and "[m]asters have been used extensively to formulate plans and recommendations").

[51] *See, e.g.*, *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974) (noting district court "found it necessary to establish the office of federal court monitor to check all the phases of prison administration, management and operation of Parchman and to determine the degree of compliance with provisions of its order dated October 20, 1972"); *Morales Feliciano v. Romero Barcelo*, 672 F. Supp. 591, 623 (D.P.R. 1986) (appointing "court monitor" to oversee enforcement of injunction and noting that "[t]he appointment of agents to supervise the implementation of remedial decrees in institutional reform litigation involving prisons and jails is well precedented").

[52] *See, e.g.*, *Gary W. v. Louisiana*, 601 F.2d 240, 244-45 (5th Cir. 1979) (affirming appointment of special master to monitor compliance with prior court order); *Carey*, 551 F. Supp. at 1180 (determining defendants were not in compliance with consent judgment and appointing special master "as a tool by which [the court] may monitor and enforce the state's performance of its obligations"). *See generally* Michael S. Lottman, *Enforcement of Judicial Decrees: Now Comes the Hard Part*, 1 Mental Disability L. Rep. 69 (1976).

ongoing remedial challenges, the courts developed oversight mechanisms "grounded on recognized equitable powers of the courts," such as receivers, custodians, and monitors.[53]

Courts that have incorporated oversight mechanisms into their remedial decrees have cited many factors to justify their use. One major factor is the existence of a "polycentric problem that cannot easily be resolved through a traditional courtroom-bound adjudicative process."[54] Another factor is a significant risk of noncompliance.[55]

---

[53] Buckholz et al., *supra*, at 789; *see also* Jaroslawa Zelinsky Johnson, Comment, *Equitable Remedies: An Analysis of Judicial Utilization of Neoreceiverships to Implement Large Scale Institutional Change*, 1976 Wis. L. Rev. 1161, 1175 (1976) (tracking the rise of the "neoreceivership," defined as "an extra-judicial court officer appointed with broad, flexible duties to formulate remedies and implement decrees protecting constitutional rights").

[54] *Hart v. Cmty. Sch. Bd. of Brooklyn*, 383 F. Supp. 699, 766 (E.D.N.Y. 1974), *aff'd*, 512 F.2d 37 (2d Cir. 1975); *accord Carey*, 706 F.2d at 963; *Hellebust*, 824 F. Supp. at 1528; *see also City of New York*, 2011 WL 4639832, at *16 ("A court monitor is necessary because the court lacks the time and resources to perform the supervisory tasks necessary to ensure that the City carries out its obligations under the Draft Remedial Order in good faith and with reasonable diligence. District courts have frequently made use of court-appointed monitors and other masters in similarly large and complex civil rights litigations where ensuring a large organization's or municipality's compliance with the court's orders would be too time-consuming or difficult for the court to undertake without assistance."). *See generally* 1 Dobbs, *supra*, § 2.8(1), at 189-91.

[55] *See, e.g.*, *Ruiz*, 679 F.2d at 1160 (listing myriad reasons court below cited in support of appointing special master including "the difficulty of superintending . . . implementation" and the "record of intransigence" and concluding that "the court was not required to await the failure or refusal of [the defendant] to comply with the decree before appointing an agent to implement it" because "[n]oncompliance may constitute one 'exceptional condition' under rule 53, but it is not exclusive" (footnote omitted)); *Gary W.*, 601 F.2d at 245 (affirming appointment of special master where "proceedings have now been pending for over four years and a significant number of the children involved still have not been accorded the relief ordered"); *Morgan*, 540 F.2d at 533 ("The more usual remedies [such as] contempt proceedings and further injunctions were plainly not very promising, as they invited further confrontation and delay; and when the usual remedies are inadequate, a court of equity is justified, particularly in aid of an outstanding injunction,

Both factors are present in this case. The sale of a company like Oxbow is inherently a "polycentric problem" requiring concerted efforts from principals, advisors, and market participants. Absent the aid of a court-appointed agent, it will be difficult for the court to remain informed about developments, much less properly oversee compliance with its orders. Equally important, given the parties' behavior to date, there is reason to believe that they will clash on many issues and seek to acquire advantages whenever possible. That was true during the events giving rise to this litigation, it was true during this litigation, and it almost certainly will be true after this litigation. Having overseen this case for two years, addressed a plethora of disputes, presided over the trial, and heard the principals testify firsthand, I am convinced that disputes are likely to arise and to require ongoing judicial involvement during the remedial phase. Although I hope to be disappointed in this prediction and for the parties to have the satisfaction of proving me wrong, at this point I believe it is necessary to put in place a mechanism to help the parties solve their polycentric problem and minimize the number of disputes.

An oversight remedy is therefore warranted. The next question is what form should it take. "Court appointed agents are identified by a variety of terms—monitor, master, master hearing officer, human rights committee, ombudsman, administrator, advisory

---

in turning to less common ones, such as a receivership, to get the job done."); *Morales Feliciano*, 672 F. Supp. at 622 ("The record of intransigence and lengthy noncompliance by defendants constitutes an 'exceptional condition' within the meaning of Rule 53(b) authorizing the appointment of a Court Monitor."); *John B.*, 176 F. Supp. at 807 ("The Court may appoint a special master for a variety of reasons, including the 'problems associated with compliance with the district court order.'" (quoting *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990)).

committee."[56] Unfortunately, these titles lack inherent meaning or well-understood characteristics, such that "[t]erminological confusion is compounded by functional confusion."[57] For present purposes, the critical question is not what the role is called, but the nature of the charge and the powers it carries.

One possibility would be to empower a court-appointed agent to take control of Oxbow and carry out the Exit Sale process.[58] Although it is tempting to preempt the problem of future disputes by putting a neutral person in charge, I do not believe there is

---

[56] Montgomery, *supra*, at 105.

[57] Buckholz et al., *supra*, at 827.

[58] This charge would fall within the traditional role of a receiver or custodian. *See* Clark, *supra*, § 235, at 346-47 ("Where a court of chancery obtains jurisdiction of the subject-matter of a suit it will retain jurisdiction until complete justice has been done between the parties, and such jurisdiction is frequently exercised after final decree by the appointment of a receiver." (footnote omitted)); Pomeroy, *supra*, § 1335, at 931 (discussing "cases in which a receiver is appointed after judgment for the purpose of carrying the [court's] decree into effect"); *see also* Clark, *supra*, § 11(a), at 13 (describing a receiver as "an officer of the court [appointed] to receive, collect, care for, administer, and dispose of the property or the fruits of the property of another or others brought under the orders of court by the institution of a proper action or actions"). Delaware jurisprudence generally uses the term "custodian" when the appointment involves a solvent corporation and the court-appointed agent is not charged with winding up the corporation's affairs and selling off its assets. Otherwise, the distinction between receiver and custodian does not appear to be substantive. *See* 8 *Del. C.* § 226 (providing that a custodian has "all the powers and title of a receiver . . . but the authority of a custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets"); *see also In re Shawe & Elting LLC*, 2015 WL 4874733, at *1, *9 (Del. Ch. Aug. 13, 2015) (appointing a custodian to "sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders" where "the state of management of the corporation has devolved into one of complete dysfunction . . . resulting in irretrievable deadlocks over significant matters"), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

23

need (yet) to go that far. The LLC Agreement contemplates that both the Minority Members and the Board will cooperate to effectuate an Exit Sale.[59] They should be given a chance to do so.

A less intrusive possibility involves appointing an officer of the court empowered to monitor compliance with the court's order, but not to enforce the order directly.[60] "The monitor's role is to report on the defendant's compliance with the decree and on the achievement of the decree's goals."[61] Rather than making a report and recommendation to the court, the monitor typically makes recommendations to the parties and "resort[s] to

---

[59] *See* Dkt. 142 ¶¶ 24-32.

[60] Traditionally, this was one possible role for a master. *See* 1 Dobbs, *supra*, § 2.8(1), at 190; 3 Dobbs, *supra*, § 12.8(3), at 207-10. In this jurisdiction, however, the concept of a master has become associated with a decision-making function comparable to a federal magistrate judge, which is another traditional role that a master could fulfill. To that end, the Court of Chancery Rules specify procedures for the use of masters that are predominantly tailored to the referral of a discreet question for decision, with the master providing the court with a report containing a recommended answer. *See* Ct. Ch. R. 136, 144. The rules empower masters to issue subpoenas for persons and records, Ct. Ch. R. 137, and require that proceedings before them be transcribed for purposes of review, Ct. Ch. R. 138. Parties can take exception to the master's report and recommendation, which the court reviews *de novo*. *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999). The rules do contemplate one less decisional, more active role for a master: Rule 81 empowers the court to appoint a master to oversee corporate elections. *See* Ct. Ch. R. 81(2) (empowering the Court of Chancery to "appoint a Master to hold such election not less than 20 days after the Master's appointment at a time and place to be fixed by the Court, or by said Master as the Court shall order, any provision of the charter or bylaws of the corporation to the contrary notwithstanding").

[61] Buckholz et al., *supra*, at 828; *see also* Montgomery, *supra*, at 106 ("The main purpose of a monitor is to investigate a defendant's activities and report to the court regarding his compliance with the court order.").

24

court enforcement only when these overtures have failed."[62] "Monitors normally have no enforcement powers; their role is to observe a defendant's activities and to elicit cooperation in settling technical problems which would otherwise require judicial hearing and decision."[63]

In my view, appointing a monitor is the best option under these circumstances. The monitor will supervise the parties' compliance with the decree of specific performance. The monitor will not have decisional authority of its own and will not have the power to compel the parties to take a particular course of action. The monitor is encouraged to evaluate the parties' conduct objectively, provide suggestions, and facilitate the resolution of disputes. If the monitor believes that the parties are not complying with the court's order and the monitor's efforts to persuade have failed, the monitor will be free to communicate with the court. Depending on the content of the report, the court may take action.

To fulfill this role, the monitor will have expansive informational rights. The monitor will have access to any books and records of Oxbow that the monitor believes in subjective good faith are helpful to fulfilling the monitorship role. The monitor may seek summary determinations from the court to enforce these informational rights, which are at least as broad as the rights afforded a director under Section 220(d) of the Delaware General Corporation Law.[64] In addition, the parties shall copy the monitor in real time on

---

[62] Note, *Monitors: A New Equitable Remedy?*, 70 Yale L.J. 103, 113 (1960).

[63] Montgomery, *supra*, at 106 (footnote omitted).

[64] *See* 8 *Del. C.* § 220(d) ("Any director shall have the right to examine the corporation's stock ledger, a list of its stockholders and its other books and records for a

all written communications relating to the Exit Sale unless the monitor requests otherwise. The parties also shall allow the monitor to participate in any other communication relating to the Exit Sale, whether in-person, telephonic, or otherwise.

The monitor will provide the court with monthly status reports and may submit reports more frequently if warranted. If the parties have a dispute, then they will present the dispute to the monitor in the first instance so that the monitor can attempt to facilitate a resolution. If those efforts are unsuccessful, then the parties may present their concern to the court by motion. Briefing will not proceed unless the monitor confirms that the parties consulted with the monitor beforehand. After briefing, the monitor will provide the court with a recommendation regarding the proper outcome.

An important question when appointing any court-appointed agent is who will bear the expense. Because the breach of the Reasonable Efforts Clause necessitated the decree of specific performance and the appointment of the monitor, Oxbow Holdings will bear that burden.

---

purpose reasonably related to the director's position as a director."); *Intrieri v. Avatex Corp.*, 1998 WL 326608, at *1 (Del. Ch. June 12, 1998) ("[A] sitting director is entitled to unfettered access to the books and records of the corporation for which he sits and certainly is entitled to receive whatever the other directors are given."); *Holdgreiwe v. Nostalgia Network, Inc.*, 1993 WL 144604, at *3 (Del. Ch. Apr. 29, 1993) (Allen, C.) ("A director of a Delaware corporation has the right to inspect corporate books and records; that right is correlative with his duty to protect and preserve the corporation. He is a fiduciary and in order to meet his obligation as such he must have access to the books and records; indeed he often has a duty to consult them." (quoting *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 128 (Del. Ch. 1969))).

Additional proposed terms for the monitor's appointment are set forth in the form of order included in this decision as Appendix A. Any order appointing the monitor will be filed only after receiving comments from the parties and the individual selected as the monitor. If the parties cannot agree on a candidate, then the Koch Parties and the Minority Members shall each submit names of three disinterested and independent individuals who are qualified and willing to serve. The submissions shall include the candidates' qualifications. Within ten days after submission, the Koch Parties may submit objections to any of the Minority Members' proposed candidates and *vice versa*. The court will then make a determination.

## C.     Compensatory Damages Based On The ArcLight Offer

A secondary and contingent component of the remedy is an award of compensatory damages related to the transaction value of the ArcLight Offer. If the decree of specific performance generates an Exit Sale that provides the Minority Members with greater consideration than the time-adjusted value of the ArcLight Offer, then this element of compensatory damages will not be warranted. If not, then an award of compensatory damages based on the lost value of the ArcLight Offer is necessary to make the Minority Members whole.

As stated previously, in an action for breach of contract, "the Court of Chancery has the discretion to award any form of legal and/or equitable relief and is not limited to awarding contract damages for breach of the agreement."[65] "Equity may, when its

---

[65] *Gotham P'rs*, 817 A.2d at 176; *accord Eureka VIII*, 899 A.2d at 107.

27

jurisdiction is invoked to obtain specific performance of a contract, award damages or pecuniary compensation along with specific performance when the decree as awarded does not give complete and full relief."[66] "This is an outgrowth of the doctrine that a court of equity, having once assumed jurisdiction on equitable grounds, will adjudicate all matters properly presented by and actually involved in the case."[67]

The Koch Parties view any award of compensatory damages as inconsistent with and foreclosed by the decree of specific performance. They perceive an award of damages and a decree of specific performance to be exclusive alternatives yielding an "either/or" proposition for the court. That approach conflicts with the flexible nature of equitable remedies and the court's ability to tailor its remedy to the facts.[68] It also conflicts with the role of equity in providing complete relief. "A fundamental principle of equity is . . . that if equity has and takes jurisdiction of a cause, it will give relief in a manner to settle the controversy for all time, even though in so doing it must necessarily award relief not

---

[66] *Mills v. Gosling Creek, Inc.*, 1993 WL 485901, at *3 (Del. Super. Oct. 6, 1993).

[67] *Tri State Mall Assocs. v. A.A.R. Realty Corp.*, 298 A.2d 368, 371 (Del. Ch. 1972).

[68] *See* Wolfe & Pittenger, *supra*, § 12.01[a], at 12-2 ("Having arisen largely to compensate for the common law's inability to provide full, fair, and just relief in all instances, equity has evolved as a broad and flexible concept, designed to employ judicial principles and tools creatively so as to effect justice in any given circumstance."); Pomeroy, *supra*, § 109, at 141 ("Equitable remedies . . . are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application . . . .").

necessarily of purely equitable nature."[69] In other words, "when equity obtains jurisdiction over some portion of the controversy it will . . . give complete and final relief."[70]

In this case, the Koch Parties not only breached the Reasonable Efforts Clause, but did so in a way that caused the loss of the ArcLight Offer. If the Koch Parties had breached the Reasonable Efforts Clause at a time when no actionable transaction had been obtained, then only a decree of specific performance requiring compliance with the Exit Sale Right would be warranted, and there would be no need to go further. Here, however, the Minority Members had obtained an actionable transaction in the form of the ArcLight Offer, and the Koch Parties' breach deprived the Minority Members of the benefits of that offer. Consequently, an award of compensatory damages is necessary if the decree of specific performance does not generate value for the Minority Members that both equals or exceeds what they would have received under the ArcLight Offer and compensates them for the lost time value. Without this additional remedial component, the Minority members would not be made whole.

---

[69] *Tull v. Turek*, 147 A.2d 658, 664 (Del. 1958).

[70] *Wilmont Homes*, 202 A.2d at 580; *accord* 1 Pomeroy, *supra*, § 231, at 410 ("[W]here a court of equity has obtained jurisdiction over some portion or features of a controversy, it may, and will in general, proceed to . . . award complete relief, although the rights of the parties are strictly legal, and the final remedy granted is of the kind which might be conferred by a court of law."); Wolfe & Pittenger, *supra*, § 12.10[b][1], at 12-119 ("It is well settled that when the Court of Chancery obtains jurisdiction over a controversy, it will decide the entire matter, and give complete relief." (citing *Naughty Monkey LLC v. Marinemax Ne. LLC*, 2010 WL 5545409 (Del. Ch. Dec. 23, 2010)). This principle is most often invoked when rejecting challenges to equitable jurisdiction, but its availability for that purpose early in the litigation implies that the power exists for purposes of crafting remedies at the end of the litigation.

The Koch Parties also argue that the ArcLight Offer cannot be used as a baseline for damages because the Minority Members never offered to facilitate closing by paying a Seller Top Off. According to the Koch Parties, the Minority Members' failure to make this offer means that the ArcLight Offer was not actionable. In my view, this argument is another effort to turn lemons (losing at trial on the Seller Top Off issue) into lemonade (an argument foreclosing a damages remedy). When the ArcLight Offer was received, the parties disagreed about how to interpret the LLC Agreement, with both sides advancing different interpretations. Those competing interpretations led to this litigation and the eventual issuance of the Post-Trial Ruling, which authorized a Seller Top Off. If the Minority Members had anticipated this ruling, they doubtless would have offered a Seller Top Off, as they are now prepared to do. At the time, the Minority Members suggested a Seller Top Off as part of a compromise, but the Koch Parties insisted on the Highest Amount Theory as part of their effort to avoid any Exit Sale.[71] If the Koch Parties had cooperated, as required by the Reasonable Efforts Clause, the parties likely would have reached agreement on a compromise and a transaction could have closed.

The Koch Parties also contend that the value of the ArcLight Offer must be reduced to account for the $27 million that the Minority Members would have paid to the Small Holders as part of the Seller Top Off. The proper measure of compensatory damages for the loss of the ArcLight Offer is the difference between what the Minority Members would have received in 2016, adjusted to reflect lost time value, and what they will receive in a

---

[71] *See Post-Trial Ruling*, 2018 WL 818760, at *64-66.

future sale. This proposition can be reduced to the following formula: (adjusted ArcLight Offer price – 2016 Seller Top Off) – (sale price in Exit Sale resulting from decree – Seller Top Off in that sale).

The Koch Parties further contend that any award of compensatory damages must account for distributions that the Minority Members have received since the date when a sale pursuant to the ArcLight Offer would have closed. I agree.[72] If a sale based on the ArcLight Offer had closed, the Minority Members would not have received the subsequent distributions. As a result, they should not receive both the benefit of the distributions *and* damages based on the amount of the ArcLight Offer. The value of the distributions must be backed out. The distributions also reduce the amount necessary to satisfy the 1.5x Clause for the Small Holders and thus must be taken into account when determining the cost of a future Seller Top Off. These adjustments require present-value calculations to account for the time-value of money and ensure that the ArcLight Offer, the distributions, and the Exit Sale are valued using equivalent units. Those calculations can best be accomplished after an Exit Sale has been achieved.

## D. Compensatory Damages For Expenses From The Frustrated Exit Sale

The Minority Members seek an additional award of compensatory damages equal to their share of (i) the amounts Oxbow paid to Mintz Levin and (ii) any duplicative

---

[72] *See Henkel Corp. v. Innovative Brands Hldgs., LLC*, 2013 WL 396245, at *6 (Del. Ch. Jan. 31, 2013) ("Were it not for IBH's failure to close on the Agreement, IBH would have gained possession of the Business and obtained any income it generated during the Interim Period. Henkel's reasonable expectations are limited to any revenues generated by the Business until the date it would have sold the Business to IBH under the Agreement.").

31

amounts that must be paid to Goldman or Cravath. In my view, both resulted from the breach of the Reasonable Efforts Clause and should be awarded as compensatory damages.

The Minority Members argue that Mintz Levin acted as Koch's *de facto* personal counsel and took the lead in the efforts to delay, obstruct, and derail the Exit Sale. They contend that Koch caused Oxbow to hire Mintz Levin for the self-interested purpose of shifting one-third of the expense onto the Minority Members. Because the Minority Members own approximately one-third of Oxbow's interests while Koch and his family members indirectly own approximately two-thirds,[73] causing Oxbow to pay for Mintz Levin meant that the Minority Members were paying one-third of the bill. The amount is not trivial: The Minority Members estimate that Koch has caused Oxbow to pay Mintz Levin approximately $50 million. The Minority Members further explain, with the support of an expert affidavit, that they will not be able to recapture the resulting value loss in an Exit Sale. A buyer will pay for Oxbow as it is, depleted by the approximately $50 million spent on Mintz Levin, resulting in the Minority Members receiving approximately $16.7 million less than they would have received if Koch had paid for Mintz Levin himself. Implicit in the Minority Members' argument is the view that Company counsel should not have taken sides in this control dispute. As in a derivative action that has survived a motion to dismiss pursuant to Court of Chancery Rule 23.1, or a dispute over the outcome of an election of directors under Section 225 of the Delaware General Corporation Law, Oxbow and its counsel should not have been picking sides.

---

[73] *See Post-Trial Ruling*, 2018 WL 818760, at *64.

32

In response, the Koch Parties argue that the Minority Members are seeking a form of fee shifting that would contravene the American Rule. Under that rule, American courts generally do not include litigation expenses, including attorneys' fees, in a damages award.[74] But in a typical fee-shifting case, a party seeks to recover its own litigation expenses from the other side. The Minority Members are not arguing that their own litigation expenses should be part of their recovery. They are seeking to recover litigation expenses incurred by Oxbow which, because of how Koch arranged the representation, resulted in damages suffered by the Minority Members. To my mind, that is a form of damages that a compensatory award can remedy.

Next, the Koch Parties contend that any effort to recover the value of a portion of Mintz Levin's fees is a classic derivative claim that has not been asserted in this action. Payments made to Mintz Levin indeed can and typically would be conceptualized formally as an injury to Oxbow that would be subject to recovery in a derivative action.[75] But there are two reasons to depart from that characterization here. First, there are some cases, typically involving closely held entities, in which "the relationships among the parties may be so simple and the circumstances so clear-cut that the distinction between direct and

---

[74] *See, e.g.*, *McNeil v. McNeil*, 798 A.2d 503, 514 (Del. 2002) ("The American rule, which is of general application, requires each side to bear the cost of its attorney's fees."); *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996) ("Pursuant to the American Rule, prevailing litigants are responsible for the payment of their own attorney's fees." (footnote omitted)).

[75] *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).

derivative claims becomes irrelevant."[76] This is one of those cases. The dispute pits the Minority Members on the one side against Koch, his family members, and their affiliates on the other side. The dispute is two sided and zero sum (at least in terms of the Mintz Levin expenses). There is also no need to require the filing of a separate derivative action to ensure that the doctrine of demand futility can protect the Board's ability to determine the fate of a Company asset. The record evidence in this case established that Koch controls the Board and frequently acts unilaterally, rendering demand futile.[77]

A second reason to disregard the derivative characterization is that Oxbow suffered the harm in connection with its sale, albeit as part of a sale process that was frustrated prematurely and will now be resumed by judicial decree. The doctrine of *Parnes v. Bally Entertainment Corp.*,[78] therefore permits a direct characterization. As the plaintiffs did in *Parnes*, the Minority Members argue that the harm to Oxbow means that they will receive insufficient value in the Exit Sale. The *Parnes* court treated that type of harm as direct. In this case, the direct characterization seems all the more apt because the harm flows from the Koch Parties' breach of a contractual right benefitting the Minority Members.[79]

---

[76] *In re Cencom Cable Income P'rs, L.P.*, 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000); *accord Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 150 (Del. Ch. 2003).

[77] *See White v. Panic*, 783 A.2d 543, 551 n.24 (Del. 2001); *Aronson v. Lewis*, 473 A.2d 805, 816-17 (Del. 1984) (subsequent history omitted).

[78] 722 A.2d 1243, 1245-46 (Del. 1999).

[79] I recognize that the Delaware Supreme Court has held that when the contractual right appears in the constitutive document of an entity, as here, the contractual nature of the claim does not affect its proper characterization as direct versus derivative. *See El Paso*,

34

In this case, the evidence established that Koch originally interviewed and retained Mintz Levin as his personal counsel. Koch previously had used in-house Company counsel to analyze his rights, but both Oxbow's then-General Counsel, Michael McAuliffe, and one of Koch's key advisors at the time, Christine O'Donnell, recommended that Koch retain separate counsel to advise him personally.[80] In May 2015, after considering several firms, Koch selected Mintz Levin. The firm's primary task was to evaluate the situation Koch faced and advise him on what was in his best interest.[81] Consistent with Mintz Levin's role as Koch's personal counsel, the firm's engagement letter described the firm as representing Koch and his wife "in connection with your stock ownership of [Oxbow Holdings and Oxbow] as well as estate planning matters."[82]

After taking on the engagement, Mintz Levin nominally slid into the role of Company counsel. In August 2015, Koch and Mintz Levin modified the firm's engagement letter so that Mintz Levin represented Oxbow.[83] No satisfactory explanation was ever provided for this shift. I personally believe Koch wanted Oxbow's counsel to be loyal to

---

152 A.3d at 1257-62. As Professor Manesh has noted, the fact that an investor's ability to enforce contractual rights under an operating agreement can be re-characterized as a derivative claim belonging to an entity and consequently foreclosed by equitable standing doctrines is one among a baker's-dozen reasons why LLCs are not wholly contractual and only partially creatures of contract. *See* Mohsen Manesh, *Creatures of Contract: A Half-Truth About LLCs*, 42 Del. J. Corp. L. 391, 445-46 (2018).

[80] *See Post-Trial Ruling*, 2018 WL 818760, at *28-31.

[81] *Id.* at *28-29.

[82] JX 1045.

[83] JX 1311.

him, liked the idea that Mintz Levin would be in a position to run Oxbow's internal investigations into Koch's perceived adversaries, and understood that the Minority Members would effectively pay one-third of Mintz Levin's fees. Koch added Ropes & Gray to the team as his personal counsel, but Mintz Levin took the lead, with Ropes & Gray in a secondary role.

Although Mintz Levin nominally represented Oxbow, the firm's loyalties ran to Koch. When the lawyers at the firm analyzed issues, developed strategies, and recommended actions for Oxbow to take, they did so based on what was best for Koch. Likewise, Koch viewed Mintz Levin as one of his agents in the fight against the Minority Members. During a meeting of the directors appointed by Oxbow Holdings in January 2016, Koch demanded that Oxbow and its counsel work to "obstruct," "derail," and "delay" the Exit Sale process.[84] Shortly after the meeting, Koch asked both Ropes & Gray and Mintz Levin to "[d]evise a lawsuit" or "devise something on [the Exit Sale]" to avoid having to sell Oxbow.[85] Both firms analyzed various options, and together they identified over a dozen different strategies.[86] Mintz Levin eventually developed the Highest Amount Theory that became one of the focal points of this litigation.[87] Mintz Levin generated this theory while preparing a letter that was "nominally prepared on behalf of Oxbow and

---

[84] JX 2068 at DEF-EPJ_00021726.

[85] Koch Tr. 1085-86; *see also* JX 2224 at Mintz_0005152.

[86] *See, e.g.*, *Post-Trial Ruling*, 2018 WL 818760, at *34-35.

[87] *See id.* at *41-42

directed to the member-level participants in the Exit Sale process," but which "in substance

. . . raised objections to the ArcLight offer that served Koch's interests."[88]

During this litigation, because he controlled Oxbow, Koch caused Mintz Levin to take positions against the Minority Members. As Company counsel, Mintz Levin took the laboring oar in the litigation, effectively working on Koch's behalf.

In my view, under these circumstances, a court of equity can address the realities of this two-sided dispute, look past the derivative characterization, and award the Minority Members their proportionate share of the amounts paid to Mintz Levin. For Koch, causing Oxbow to retain Mintz Levin was a simple and straightforward means of forcing the Minority Members to bear one third of an expense that Koch himself should have born. That harm flowed directly from and was inextricably tied to the breach of the Reasonable Efforts Clause. But for Koch's personal desire to oppose an Exit Sale, Oxbow never would have needed to hire Mintz Levin. The Minority Members are therefore entitled to compensatory damages equal to their proportionate share of any amounts paid by or on behalf of Oxbow to Mintz Levin.

The Minority Members also seek to recover any duplicative amounts that Oxbow incurs to compensate Goldman and Cravath for the resumed Exit Sale. Unlike with the Mintz Levin expenses, the Minority Members are not arguing that Oxbow wrongfully incurred amounts for Goldman and Cravath. They are arguing that Oxbow properly paid those advisors, but then Koch wrongfully deprived Oxbow of the value of their services by

---

[88] *Id.* at *41.

frustrating the Exit Sale process. It seems likely that some of the value of Goldman and Cravath's prior work was lost when Koch frustrated the Exit Sale, that Goldman and Cravath will have to redo some of the work, and that the resulting duplicative payments will harm Oxbow. As with the Mintz Levin expenses, the Minority Members will not recoup their share of this lost value through an Exit Sale.

At present, it is not clear that there will be any duplicative work. If, however, the Minority Members can show that Oxbow incurred duplicative expenses, then the harm will flow directly from Koch's breach of the Reasonable Efforts Clause. In this two-sided dispute involving a sale process, I believe that the award of damages to the Minority Members can and should include the Minority Members' proportionate share of any duplicative amounts paid to Goldman and Cravath.

## E.    Interest and Costs

Prejudgment interest in Delaware cases is awarded as a matter of right.[89] Subject to the court's discretion, a party is also entitled to post-judgment interest until the date of payment on an amount that includes both the amount of the judgment and the amount of prejudgment interest.[90] Unless the parties have specified another rate by contract or the court determines that a different rate is warranted by the equities, the statutory rate serves

---

[89] *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 485-86 (Del. 2011).

[90] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 620-21 (Del. Ch. 2010).

as a guide.[91] The court has discretion to award compound interest, which is warranted here.[92] The court also has discretion to select a compounding interval, which in this case will be quarterly.[93] The rate will fluctuate with changes in the underlying legal rate.[94]

In a breach of contract case, interest runs from the date "when the effects of the breach would have first manifested themselves."[95] For purposes of calculating prejudgment interest on any transactional damages, the applicable date is the date on which the Minority Members would have received their proceeds from the Exit Sale contemplated by the

---

[91] *See* 6 *Del. C.* § 2301(a) (establishing legal rate); *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988) ("While the legal rate of interest has historically been the benchmark for pre-judgment interest, a court of equity has broad discretion, subject to principles of fairness, in fixing the rate to be applied. In the Court of Chancery the legal rate is a mere guide, not an inflexible rule." (citations omitted)).

[92] *See Brandin v. Gottlieb*, 2000 WL 1005954, at *28-30 (Del. Ch. July 13, 2000) (Strine, V.C.) (explaining rationale for awarding compound interest instead of simple interest); *accord ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 929 (Del. Ch. 1999); *see also Smith v. Nu-West Indus.*, 2001 WL 50206, at *1 (Del. Ch. Jan. 12, 2001) (following *Brandin*). *But see Branin v. Stein Roe Inv. Counsel, LLC*, 2015 WL 4710321, at *8 (Del. Ch. July 31, 2015) (adhering to precedent construing 6 *Del. C.* § 2301 as permitting only simple interest).

[93] *See Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *13 (Del. Ch. July 25, 2003) (applying quarterly compounding interval when awarding interest based on the legal rate "due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly"); *accord One Va. Ave. Condo. Ass'n of Owners v. Reed*, 2005 WL 1924195, at *15 (Del. Ch. Aug. 8, 2005). *But see* Charles K. Korsmo & Minor Myers, *Interest in Appraisal*, 42 J. Corp. L. 109, 129-30 (2016) (questioning validity of comparison between legal rate and bonds).

[94] *See Levey v. Brownstone Asset Mgmt., LP*, 2014 WL 4290192, at *1 (Del. Ch. Aug. 29, 2014) (explaining rationale for fluctuating rate).

[95] *BTG Int'l Inc. v. Wellstat Therapeutics Corp.*, 2018 WL 2966941, at *1 (Del. June 11, 2018) (TABLE).

39

ArcLight Offer. Oxbow's advisors believed that a transaction on the terms set forth in the ArcLight Offer could have closed by August 2016.[96] The Minority Members' expert used September 30, 2016 as the closing date for such a transaction.[97] The Koch Parties' expert did not take issue with that date.[98] This decision therefore adopts it.

In addition to interest, the Minority Members are awarded costs. "Except when express provision therefor is made either in a statute or in these Rules, costs shall be allowed as of course to the prevailing party unless the Court otherwise directs."[99] Although there were many issues and sub-issues in this case, the basic question was whether Oxbow had to be sold. The Minority Members prevailed on that overarching issue and therefore are the prevailing parties in the case.

## II.     CONCLUSION

The Minority Members are awarded the relief described in this decision. The parties shall take steps to select a monitor. Once an individual has been selected, the monitor will provide comments to the parties on the proposed form of order. If the monitor and the parties cannot agree, then they may submit competing forms of order. Once the resumed Exit Sale process is complete, further proceedings will be necessary to determine specific amounts for the awards of compensatory damages, interest, and costs.

---

[96] *Post-Trial Ruling*, 2018 WL 818760, at *68-69.

[97] *See* JX 2992 ¶ 17 n.33.

[98] *See* Dkt. 1227.

[99] Ct. Ch. R. 54(d).

## APPENDIX A

### ORDER APPOINTING MONITOR

1. <u>APPOINTMENT OF MONITOR</u>: _____ of _____ (the "Firm") is appointed Monitor with the powers and duties specified in this Order. The Monitor shall have authority, but shall not be required, to petition this court for instructions at any time or from time to time. The Monitor may seek to modify the terms of this Order, including by seeking supplemental authority under this Order, for good cause shown.

2. <u>ACCEPTANCE AND TERM OF APPOINTMENT</u>: The Monitor shall file in this court a written acceptance of this appointment. The Monitor shall serve at the pleasure of the court, and the provisions of this Order shall remain in effect pending further order of the court.

3. <u>AUTHORITY</u>: The Monitor has the power and authority necessary to fulfill the charge set forth in this Order. The Monitor's specific authority is defined as follows:

(a) The Monitor has authority to communicate with the parties jointly or separately. The Monitor has authority to consult with the court *ex parte* (without the participation of the parties).

(b) The Monitor has authority to convene meetings of the parties. Unless the Monitor determines otherwise, the parties shall (i) include the Monitor on any correspondence, including by email, relating to the Exit Sale and (ii) include the Monitor in any meetings regarding the Exit Sale, whether conducted in-person, telephonically, or otherwise.

(c) The Monitor has authority to make recommendations to the parties regarding the Exit Sale.

1

(d)     If the parties have a dispute, they shall present it in the first instance to the monitor, who shall attempt to facilitate a resolution. Once the monitor has determined that those efforts have been unsuccessful, then the parties may apply to the court. The monitor shall certify to the court that the parties complied with this requirement.

(e)     The Monitor has authority to file written recommendations to the court in connection with any dispute relating to the Exit Sale raised with the court by the parties.

4.     INFORMATIONAL RIGHTS: Oxbow shall provide the Monitor with any books and records of Oxbow that the monitor believes in subjective good faith would be helpful in fulling the charge set forth in this Order.

5.     REPORTING TO THE COURT: Within thirty days of appointment, the Monitor shall provide a report to the court and the parties concerning a proposed plan of sale. Thereafter, the Monitor shall provide a report to the court at least every thirty days concerning the progress of the Monitor's efforts. Such reports may be filed under seal, in which case they shall be made available only to the court, the parties, and their counsel.

6.     COMPENSATION OF THE MONITOR: Oxbow Holdings shall pay the compensation and expenses of the Monitor. The Monitor may bill at the Monitor's customary hourly rates. The Monitor may make use of individuals within the Firm, who shall be paid at their customary hourly rates. The Monitor shall petition the court on a monthly basis for approval of compensation and reimbursement of expenses with copies of the amounts sought sent to counsel for the parties. All fees and expenses approved by the court shall be paid promptly by Oxbow Holdings. In the event of non-payment, all fees

2

and expenses approved by the court shall be paid by the Company, subject to a right of subrogation against Oxbow Holdings. Payment of the fees and expenses of the Monitor shall have priority over all other obligations, payments, and distributions of the Company.

7. CONSULTATION WITH CONSTITUENCIES: The Monitor may consult with Oxbow's constituencies, including managers, members, officers, unitholders, creditors, employees, customers, and suppliers, with respect to the performance by the Monitor of the Monitor's duties, but shall not be subject to the direction or control of any such constituency and shall not be required to take any course of action that any such constituency may favor or disfavor.

8. COOPERATION: The appointment of the Monitor is binding upon the managers, officers, employees, agents, and unitholders of Oxbow, who shall cooperate with the Monitor in the performance of the Monitor's duties. No party to this action, and no other person acting or purporting to act as a manager, member, officer, employee, agent, or unitholder of Oxbow, shall institute any proceeding in any forum other than this court challenging any action, recommendation, or decision by the Monitor.

9. EXCULPATION, INDEMNIFICATION, AND ADVANCEMENT: The Monitor shall have no liability to Oxbow, its unitholders, or any other person for actions taken in good faith pursuant to this Order. The Monitor shall be entitled to all protection, limitation from liability, and immunity available at law or in equity to a manager of Oxbow including, without limitation, all protection, limitation from liability, and immunity provided by the provisions of the LLC Agreement and applicable law. The Monitor shall be entitled to indemnification from the parties for any losses arising by reason of or in

3

connection with the Monitor's designation as Monitor for Oxbow unless the Monitor acted in subjective bad faith. The priority of the obligation to indemnify the Monitor shall be (i) Oxbow Holdings, (ii) the Company, and (iii) the Minority Members. Expenses, including attorneys' fees, incurred by the Monitor in defending any civil, criminal, administrative, or investigative action, suit, or proceeding arising by reason of or in connection with the Monitor's designation as Monitor for Oxbow, or the performance of the Monitor's duties hereunder, shall be paid by Oxbow Holdings monthly in advance of the final disposition of such action, suit, or proceeding subject to the repayment of such amount if it shall be ultimately determined by this court that the Monitor is not entitled to be indemnified by Oxbow under applicable Delaware law. In the event of non-payment by Oxbow Holdings, advancements shall be provided by the Company, subject to a right of subrogation against Oxbow Holdings. Payment of the fees and expenses of the Monitor shall have priority over all other obligations, payments, and distributions of the Company.

10.     STANDARD OF REVIEW FOR THE MONITOR'S ACTIONS: All actions of the Monitor shall be presumed to have been made on an informed basis, in good faith, and in the honest belief that such actions taken were in the best interests of the Company.

_____
Vice Chancellor
Dated:

4